James MOODY, Trustee of the Estate of Jeannette Corporation, et al., Plaintiffs,

v.

SECURITY PACIFIC BUSINESS CREDIT, INC., et al., Defendants,

v.

Calvin McCRACKEN, et al., Additional Defendants.

In re JEANNETTE CORPORATION, t/a Jeannette Glass, Debtor.

John POLOJAC and American Flint Glass Workers Union of North America, Local No. 535, Movants,

v.

JEANNETTE CORPORATION, t/a Jeannette Glass, Respondent.

Civ. A. Nos. 83–2383, 86–2239, 86–2697, 87–0268, 87–0269, 87–1753, 87–2384, 87–2385, and 87–2386.*

Bankruptcy No. 82–3265.

Motion No. 87–531M.

United States District Court, W.D. Pennsylvania, Civil Division.

March 15, 1988.

Opinion March 29, 1988.

---

* NOTE: Civil Action No. 83–2383, is the principal case and is referred to herein as "the fraudulent conveyance litigation" which is directly related to the Bankruptcy case numbered 82–3265. The other eight above-numbered civil actions are related to the principal case.

George E. McGrann, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for Coca–Cola Bottling Co. of N.Y. and New York Development.

Grace S. Harris, Pittsburgh, Pa., for Calvin McCracken.

Philip Beard, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, Pa., for Unsecured Active and Retired Employees.

Robert J. Cindrich, Mansmann, Cindrich & Titus, Pittsburgh, Pa., for Unsecured Creditors Committee.

Christopher J. Keith, Bell, Boyd & Lloyd, Chicago, Ill., Robert O. Lampl, Pittsburgh, Pa., for Robert M. Janowaik and Interdyne Inc.

H. Woodruff Turner, Kirkpatrick & Lockhart, Pittsburgh, Pa., for debtor's Board of Directors (Brogan Group) (Jeannette Corp.)

Robert L. Potter, Strassburger McKenna Gutnick & Potter, Pittsburgh, Pa., for Frank Storey.

David J. Humphreys, Humphreys & Nubani, Pittsburgh, Pa., for Unsecured Trade Creditors.

Angie Arnett, Pension Benefit Guar. Corp., Washington, D.C.

Douglas Campbell, Stanley Levine, Campbell & Levine, Pittsburgh, Pa., for trustee, James Moody.

Sanford M. Lampl, Lampl, Sable, Makoroff and Libenson, Pittsburgh, Pa., Michael Pappone, Thomas Fuchs, Goldstein & Manello, Boston, Mass., for debtor, Jeannette Corporation.

George L. Cass, Buchanan & Ingersoll, P.C., Pittsburgh, Pa., William F. Lloyd, Michael J. Sweeney, Sidley & Austin, Chicago, Ill., for Security Pacific Business Credit, Inc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER

SIMMONS, District Judge.

## INTRODUCTION

The issue addressed in the within findings of fact, conclusions of law, opinion and order is whether this United States District Court should grant the motion requesting that the underlying Bankruptcy Code Chapter 11, Reorganization Proceeding filed in the United States Bankruptcy Court for the Western District of Pennsylvania, at Bankruptcy No. 82–3265, should be converted into a Bankruptcy Code Chapter 7, Liquidation Proceeding under the facts and law applicable to this case.

The procedural history of this above-captioned case, the companion bankruptcy case and the related cases in this Court is indeed both complicated and voluminous involving many thousand of pages and millions of dollars. In total, there are more than two thousand docket entries involved in this matter all of which have been litigated in the District Court and the Bankruptcy Court for over a period of five years.

A recitation of the relevant factual history in this case will demonstrate that the lawyers for the various litigants have worked themselves wittingly and/or unwittingly into a procedural box.

Without the affirmative intervention of this Court, it is believed that this case will never be tried with finality. In fact, on the present state of this record it is the belief of this Court that it is absolutely impossible to successfully try this case at this time.

## FINDINGS OF FACT

All of the documents and papers relating to the above-captioned cases, including all pleadings, hearing transcripts, docket entries and court opinions, court memorandum of law, and court orders filed both at the Bankruptcy No. 82–3265, in the United States Bankruptcy Court for the Western District of Pennsylvania and in the United States District Court for the Western District of Pennsylvania, at the above-captioned Civil Action numbers, 83–2383, 86–2239, 86–2697, 87–0268, 87–0269, 87–1753, 87–2384, 87–2385 and 87–2386, and particularly volumes one and two of the Appendix

submitted herewith and prepared by this Court for use in this within proceeding are incorporated into and are made a part of these *Findings of Fact* in this matter by this reference thereto.

This case was originally docketed as Bankruptcy Case No. 82–3265, and has unfolded over the last five years as follows:

On October 4, 1982, an involuntary petition in bankruptcy was filed against Jeannette Corporation trading as Jeannette Glass. (See Bankruptcy Docket Entry No. 1, Appendix Document No. 34), wherein Douglas Campbell claimed to be the attorney for the petitioning creditors even though he purported to represent the only and sole petitioning creditor, George Hill Co. with approximately a $9,000.00 claim. (Three creditors are required to petition for involuntary bankruptcy provided that the debtor has more than twelve creditors with non-contingent claims.)

In due course, Attorney George Cheever, of Kirkpatrick and Lockhart, appeared for the debtor, Jeannette Corporation, (See Bankruptcy Docket No. 6, Appendix Document No. 34) and on October 7, 1982, Attorneys Hine and Flory, also appeared for the debtor and filed an answer and counterclaim to the "Involuntary Petition". (See Bankruptcy Docket Entry No. 7, Appendix Document No. 34)

On December 10, 1982, the debtor's attorneys moved the Bankruptcy Court to convert the Bankruptcy case from Chapter 7 to Chapter 11, of the Bankruptcy Code. (See Bankruptcy Docket Entry No. 33, Appendix Document No. 34)

After a hearing on the same day the motion to convert was filed, the Bankruptcy Judge ordered that the action was "hereby converted to Chapter 11" on December 10, 1982. (See Bankruptcy Docket Entry No. 23, Appendix Document No. 34) On the same day, December 10, 1982, an order was entered approving the appointment of nine unsecured creditors as a Committee of Unsecured Creditors (See Bankruptcy Docket Entry No. 24, Appendix Doc-

ument No. 34) and Douglas A. Campbell and Campbell and Levine were approved as the attorneys for the Committee of Unsecured Creditors, it being represented that Campbell and Levine would hold no interest adverse to the Committee because Campbell and Levine would resign as attorneys for the petitioning creditors. (See Bankruptcy Docket Entry No. 25, Appendix Document No. 34)

On the same day, December 10, 1982, when the debtor, Jeannette Corporation petitioned the Bankruptcy Court to convert the proceeding from Chapter 7 to Chapter 11, it was upon the representation of the petitioner-debtor that the debtor was able to file a plan of reorganization. (See Bankruptcy Docket Entry No. 33, Appendix Document No. 34) Also, on the same day, December 10, 1982, the debtor purportedly listed the ten largest unsecured creditors. (See Bankruptcy Docket Entry No. 34, Appendix Document No. 34)

On December 15, 1982, the Bankruptcy Judge, for the second time reappointed the same business trade creditors to the Committee of Unsecured Creditors. (See Bankruptcy Docket Entry No. 40, Appendix Document No. 34)

On December 14, 1982, the debtor in possession, Jeannette Corporation, was authorized to employ Thompson, Hine and Flory, and Lampl, Sable & Makoroff as its counsel in the Chapter 11 case. (See Bankruptcy Docket Entry No. 41, Appendix Document No. 34)

On February 9, 1983, the Committee of Unsecured Creditors applied for standing to sue on behalf of the debtor in possession, Jeannette Corporation to recover certain alleged "fraudulent transfers". (See Bankruptcy Docket Entry No. 62, Appendix Document No. 34) These allegations of fraudulent activity formed the basis of the above-captioned Civil Action No. 83–2383, (hereinafter referred to as "fraudulent conveyance litigation") which was filed September 22, 1983, in this District Court and which is now one of the main concerns of this within Opinion. (See the complaint filed in this above-captioned case at Civil

Action No. 83–2383, Appendix Document No. 35, in the United States District Court for the Western District of Pennsylvania)

On February 15, 1983, the debtor, Jeannette Corporation filed its first Plan of Reorganization under Chapter 11 of the Bankruptcy Code. (See Bankruptcy Docket Entry No. 69, Appendix Document No. 34) The plan was to be implemented by the debtor selling its glassware manufacturing division to a Pennsylvania Corporation known as Jeannette Industries, Inc., a Pennsylvania Corporation, including all of its land, buildings, and all personal property of every kind located in Westmoreland County, Pennsylvania.

Prior to this time, namely, December 27, 1982, the Bankruptcy Court approved what is referred to as "THE OLD AGREEMENT", dated December 6, 1982, wherein all of the assets owned by the debtor, Jeannette Corporation, in its glassware manufacturing division located in Jeannette, Pennsylvania, were to be sold for $4,000,000. in cash, and two notes, one for $2,500,000., and a second note for $4,049,000.

This District Court cannot find the docket entry in the Bankruptcy case record reflecting this alleged Bankruptcy Court approval of "THE OLD AGREEMENT", however, on page 11, of the Disclosure Statement for the first submitted Reorganization Plan, the "OLD AGREEMENT" is referenced. (See Bankruptcy Docket Entry No. 70, Appendix Document No. 34)

In essence, the first Plan of Reorganization was to sell the entire glassware manufacturing business of the debtor as a going concern rather than involving the debtor in a piece-meal liquidation process, wherein the various assets of the company would be disposed of separately. The potential money damage recovery to the debtor, Jeannette Corporation, from the "fraudulent conveyance" litigation which was ultimately filed against the defendants in this above-captioned civil case at Civil Action No. 83–2383, was completely discounted in the first proposed Plan of Reorganization. (See Bankruptcy Docket Entry No. 69, Appendix Document No. 34)

On March 9, 1983, the original Plan of Reorganization was amended (the Second Plan) to require the proposed purchaser of debtor's assets to pay only one million in cash and debtor was to retain the three million dollars in accounts receivable and debtor rather than the purchaser was to collect the receivables. (See Bankruptcy Docket Entry No. 76, Appendix Document No. 34)

On March 10, 1983, the Committee of Unsecured Creditors objected to the First Amended Plan of Reorganization contending that information concerning present collectable accounts receivables was suppressed; that $2,650,000.00, in assets were omitted; that the Plan's discussion of the potential "fraudulent conveyance" litigation to void a fraudulent transfer of $11,710,800.00, that allegedly occurred during a "leveraged buyout transaction" involving the debtor, was incomplete and misleading. (See Bankruptcy Docket Entry No. 77)

On February 16, 1983, at a hearing, the Bankruptcy Court addressed the February 9, 1983, "Application" of the Committee of Unsecured Creditors to obtain "standing" to sue the defendants in this above-captioned matter for the alleged "fraudulent conveyance" and said Bankruptcy Court refused to consider the "Application" on the basis that granting of the same would "sidetrack" the debtor's endeavor to obtain a confirmed Plan of Reorganization. (See page 6, paragraph E 23, of the Bankruptcy Docket Entry No. 84, Appendix Document No. 34)

The committee of Unsecured Creditors by its attorneys, Campbell and Levine, remained undaunted, and on March 17, 1983, said Committee filed a revised application for standing to sue for the alleged above-referred to "fraudulent conveyance" transaction, and in addition, requested permission to engage as Co-counsel, Mansmann, Cindrich & Huber, on a 33% contingent basis. (See page 3 of Bankruptcy Docket Entry No. 83, Appendix Document No. 34)

Additionally, on the same day, March 17, 1983, the Committee of Unsecured Creditors filed a contemporaneous motion setting forth the underlying reasons for the

Committee to have standing to prosecute the alleged fraudulent transaction, and at paragraph 21, *et seq.*, (See Bankruptcy Docket Entry No. 84, Appendix Document No. 1) the Unsecured Creditors's Committee states:

"21. The Debtor's Plan of Reorganization is not proposed in good faith. Just as was the case with the Fraudulent Transaction, the Plan of Reorganization is designed for the primary economic benefit and convenience of the Debtor's principals, seeking release of all claims arising out of the Fraudulent Transaction and no consideration.

29. In addition, the Committee believes that the Plan of Reorganization now pending will not be confirmed, based upon the following:

a. Mellon Bank, the sole Class 5 creditor under the Plan, has indicated it will reject the Plan;

b. Pension Guaranty Benefit Corporation, the sole Class 3 creditor under the Plan has indicated it will reject the Plan.

30. The Committee believes that the Estate of the Debtor-in-Possession has valid causes of action against the parties involved in and/or responsible for the Fraudulent Transaction and matters related thereto which, if properly pursued, will result in a substantial dividend to the creditors of the Estate.

31. Debtor-in-Possession is controlled by individuals or entities whose interest in the outcome of the litigation involving the Fraudulent Transaction is in conflict with the interests of the Estate and its creditors. Furthermore, the Debtor-in-Possession has stated its belief that the Estate's causes of action arising out of the Fraudulent Transaction are without value.

32. Throughout the course of the Fraudulent Transaction, present counsel to the Debtor-in-Possession acted as counsel to J. Corp. and John P. Brogan, both of whom would be named as Defendants in the proposed litigation.

33. Counsel to the Debtor-in-Possession was retained by individuals or entities whose interest in the outcome of the proposed litigation is adverse to that of the creditors and the Estate.

34. The Committee has implied authority to bring the proposed litigation and, under the circumstances, appropriate creditor protection requires that the Committee be authorized to file and pursue the same."

The Debtor-in-Possession on March 23, 1983, responded with its Third Proposed Plan of Reorganization (Although it is styled "Second Amended Plan of Reorganization") arguing that a sale of a "going" business that has "going concern value" will net more money to the creditors than a forced liquidation. Further, the Debtor suggested that as to the proposed litigation (which ultimately was the subject matter of this case now before this Court) was of little value, saying on page 26 (See Bankruptcy Docket Entry No. 94, Appendix Document No. 34) of the Second Amended Disclosure Statement in regard to said Plan, the following:

"Given the speculative nature of the claims being asserted by counsel for the Creditors Committee, the uncertainty of recovery, as well as the tremendous amount of time and expense involved in such litigation, it is Debtor's opinion that the interests of all unsecured creditors would best be served, by accepting the proposed Plan, which provides a certainty of payment as against the uncertainty and speculation of recovery from litigation".

The Committee of Unsecured Creditors objected to the Debtor's Third Proposed Plan of Reorganization (which is styled as the "Second Amended Plan of Reorganization" by filing on April 6, 1983) (See Bankruptcy Docket Entry No. 98, Appendix Document No. 34), a motion to withdraw the References from the Bankruptcy Court to the District Court. The relevant portions of said motion read as follows:

"A. *Procedural History of Case*

1. This case was commenced on October 4, 1982, by the filing of an involuntary

bankruptcy Petition under Chapter 7 against Jeannette Corporation (the "Debtor") by George Hill Company.

2. The Debtor filed an Answer and Counterclaim opposing the involuntary Petition, and a hearing on the issues was scheduled for December 10, 1982.

3. On December 10, 1982 the Debtor moved to convert the case to a voluntary one under Chapter 11, and an Order for Relief under Chapter 11 was entered that day, allowing the Debtor status as Debtor-in-Possession.

4. On December 10, 1982, the Court entered an Order appointing this Committee and authorizing the engagement of Campbell & Levine, 220 Grant St., Pittsburgh, Pa. as its legal counsel.

5. On December 10, 1983 the Committee filed and presented an Application for Appointment of an Examiner. The Court declined to entertain the Application at that time and has not since scheduled a hearing on the same.

6. On December 13, 1982 the Debtor filed a Complaint at Adversary Proceeding No. 82–2669 to sell all the assets of its Jeannette Glass Division in Jeannette, Westmoreland County, Pennsylvania to Jeannette Industries ("Complaint to Sell").

7. On December 27, 1982 an expedited hearing on Complaint to Sell was conducted by the Court and an Order confirming the sale was entered by the Bankruptcy Judge. Thereafter a Petition Requesting Review of an Order of United States Bankruptcy Judge Gerald K. Gibson and Entry of Order was presented to the District Court by the Debtor, and the Committee believes such Petition was granted and that such Order was entered. Thus, the sale was also confirmed by an Order of the District Court.

8. At the time of the hearing on the Complaint to Sell, counsel for the Debtor made the following material representations to the Court and to the Committee. (Transcript included as Exhibit "A"):

a. Equally important to the proceeds to be derived from the sale, is the fact that "the sale is going to mean jobs for people in the City of Jeannette and Westmoreland County, Pennsylvania. And that, of course, is the very important consideration." (Transcript, p. 7);

b. That the Debtor does have authority under 11 U.S.C. § 363(b), to consummate the sale prior to the formulation and confirmation of a Plan of Reorganization. (Transcript, p. 10);

c. The closing would occur by January 15, 1983. (Transcript, p. 11);

d. Because of the size of the sale, and in light of the state of the applicable law, it was appropriate to have an Order from the District Court confirming what the Bankruptcy Court had done. (Transcript, p. 13)

9. The confirmed sale to Jeannette Industries has failed to close. Accordingly, after having received $2,300,000.00, offer from Jeannette Glass Company, the Committee on February 9, 1982 filed an Application for Revocation of Confirmation of Sale and for Hearing on New Offer. This Application was presented to the Court on February 16, 1983, but was opposed by the Debtor, and was not granted.

10. On February 15, 1983 Debtor filed a Plan of Reorganization and its first Disclosure Statement.

11. At hearings held on February 16, 1983, the Committee presented an Application for Standing to Sue on Behalf of the Estate of the Debtor-in-Possession ("Application for Standing"). The facts which give rise to the litigation proposed by the Committee in the Application for Standing arise out of an $11,710,800.00 fraudulent transfer and illegal corporate dividend on July 31, 1981, involving, as defendants, the Debtor's Directors, its corporate parent, Security Pacific Business Credit, Inc., and Coca–Cola Bottling Company of New York. These facts are more specifically detailed in Section B of this Application and in the Application for Standing. (See Exhibit "C")

12. The Court refused to consider the Application for Standing, indicating that the Court was not going to "sidetrack" the Debtor's endeavors to obtain a confirmed Plan of Reorganization by "numerous

other matters that can be handled at a later date." (Transcript, p. 12) A copy of the Transcript of the February 16, 1983 hearing is included as Exhibit "B".

13. On March 23, 1983 the Committee attempted to present a Revised Application for Standing to Sue with Regard to Litigation and Issues Arising out of a Specific Transaction ("Revised Application"), which sought substantially the same relief as was sought in the Application for Standing. Again the Court indicated it would not entertain such an Application, as the same was inconsistent with the Debtor's efforts to obtain a confirmed Plan of Reorganization.

14. The Debtor has filed no less than three (3) Disclosure Statements with the Court, none of which has been approved, and all of which fail to disclose material substantial assets to the estate, and all of which have failed to provide creditors with adequate information regarding the affairs, assets and liabilities of the Debtor.

15. In summary, the bankruptcy judge has determined that the Debtor's exclusive right to file a Plan of Reorganization should effectively preclude all other parties in interest from the exercise of their independent right to take the actions necessary to investigate the affairs of the Debtor and to prevent its valuable assets from being wasted by insiders who, as will be demonstrated, have personal interests that are materially adverse to that of the estate and its bona fide creditors.

### B. *Principal Asset of the Estate*

16. The principal asset of the estate of the Debtor is a claim of at least $11,710,-800.00 against inter alia, Security Pacific Business Credit, Inc., J. Corp., the Debtor's Directors, and Coca–Cola Bottling Company of New York arising out of a fraudulent $11,710,800.00 transaction which occured on July 31, 1981. (the "Fraudulent Transaction") (Note: A law suit for this "claim" was filed in this above-captioned now being addressed in this within Opinion at C.A. No. 83–2383)

On the same day, April 6, 1983, Bankruptcy Judge Cosetti declined to act on the above-referred to "motion" to withdraw the reference from the Bankruptcy Court. (See Bankruptcy Docket Entry No. 99, Appendix Document No. 34) (See also Bankruptcy Docket Entry No. 98, Appendix Document No. 34, referred above) The Committee of Unsecured Creditors by their Attorney, Douglas Campbell, on the same day, April 6, 1983, filed three additional motions, namely, the motion requesting permission for the Committee of Unsecured Creditors to engage Co-counsel in addition to Campbell and Levine, (See Bankruptcy Docket Entry No. 100, Appendix Document No. 3); the motion requesting that the District Court should give permission allowing the Committee of Unsecured Creditors Standing to Sue in regard to the alleged "fraudulent transaction", (See Bankruptcy Docket Entry No. 101, Appendix Document No. 4); and the Application for the Appointment of a Chapter 11 Trustee. (See Bankruptcy Docket Entry No. 102, Appendix Document No. 34) These three motions as well as the Motion to Withdraw the reference as to the bankruptcy case were filed in the Bankruptcy Court and under the Bankruptcy caption, namely, In Re: Jeannette Corporation, trading as Jeannette Glass, Debtor, Chapter 11, Case No. 82–3265, although all of said pleading and motions (Docket Nos. 98, 100, 101 and 102) were addressed to the Judges of the United States District Court for the Western District of Pennsylvania.

On April 7, 1983, all of these motions were referred to United States District Judge Cohill and filed in the United States District Court at Miscellaneous No. 9851.

The motion for appointment of Co-counsel was in fact an "Application" to permit the Unsecured Creditors Committee to engage the Law Firm of Mansmann, Cindrich and Huber to act as Co-counsel with Campbell and Levine to pursue the litigation and issues arising out of "The Royal China Transfer", (this "Royal China" matter is not relevant to this opinion) and the hereinabove mentioned alleged "fraudulent conveyance" which was referred to in said

Unsecured Creditor's Application for Co-counsel.

The United States District Court was requested to allow said attorneys a contingent fee of 33% of any and all funds recovered by them while pursuing said litigation. (See Bankruptcy Docket Entry No. 100, Appendix Document No. 3)

The contingent fee request also was assigned to the United States District Judge Cohill at Miscellaneous No. 9851. Additionally, the United States District Court was requested to give the Committee of Unsecured Creditors Standing to Sue to recover money damages for the bankrupt estate because of the alleged "fraudulent conveyance" to the defendants identified in the above-captioned case. (See Bankruptcy Docket Entry No. 101, Appendix Document No. 4) The said United States District Court was also requested to appoint a Chapter 11 Trustee. (See Bankruptcy Docket Entry No. 102, Appendix Document No. 34). All of these pleadings directed to the United States District Court were supported by certain exhibits. (See Bankruptcy Docket Entry No. 103, Appendix Document No. 34)

As above noted, on April 7, 1983, the above-referred pleading that had been filed in the Bankruptcy Court, (Pleading Numbers 98, 99, 100, 101, 102 and 103) were transferred to United States Judge Cohill. A motion to stay all proceedings in the Bankruptcy Court was then filed by the Committee of Unsecured Creditors on April 12, 1983, (See Bankruptcy Docket Entry No. 112, Appendix Document No. 34) and the same was denied on April 13, 1983, by Judge Cohill. (See Bankruptcy Docket Entry No. 112, Appendix Document No. 34).

A briefing schedule and argument date (May 18, 1983) was set by the United States District Court involving all of the above-referred to pleadings and on June 8, 1983, Judge Cohill refused to withdraw the reference from the Bankruptcy Court and all of the Bankruptcy pleadings (including Bankruptcy Docket Entries numbered 98, 99, 100, 101 and 102) filed at Miscellaneous No. 9841, in the United States District Court were returned to the Bankruptcy Court

without any action being taken. (See Bankruptcy Docket Entry No. 153, Appendix Document No. 34)

In the meantime, on May 19, 1983, after the Committee of Unsecured Creditors had requested the District Court to "withdraw the reference", (April 7, 1983) but before Judge Cohill denied the request "to withdraw the reference", (June 8, 1983) the Debtor filed a Fourth Plan of Reorganization styled, "The Third Amended Plan of Reorganization". (See Bankruptcy Docket Entry No. 145, Appendix Document No. 34)

On May 23, 1983, a hearing was begun in regard to the legal viability of the Third Amended Plan of Reorganization. (See Bankruptcy Docket Entry No. 142, Appendix Document No. 34) The hearing was continued to June 13, 1983.

On June 13, 1983, the hearing on the legal viability of the Third Amended Plan continued as scheduled, and it was decided that a further hearing would continue onto July 27, 1983, and at that time the matter of appointing a Bankruptcy Trustee for the Debtor would be considered. (See Bankruptcy Docket Entry No. 151, Appendix Document No. 34) Also the appointment of Co-counsel and the question of "Standing to Sue" was to be considered.

On July 27, 1983, the continued hearing was convened and ended with an agreed upon Order, consented to by the Committee of Unsecured Creditors and the Debtor. (See Bankruptcy Docket Entry No. 165, Appendix Document No. 2)

The Order of July 27, 1983, reads in full as follows:

"IN THE UNITED STATES
BANKRUPTCY COURT

FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

IN THE MATTER OF:

JEANNETTE CORPORATION,

t/a JEANNETTE GLASS,

Debtor

Bankruptcy No. 82–3265

ORDER OF COURT

AND NOW, to-wit, this 27th day of July, 1983;

IT APPEARING that a hearing has been scheduled on the objections to the adequacy of the Debtor's Disclosure Statement; and

IT APPEARING that said Disclosure Statement is in connection with a Plan of Reorganization predicated upon the sale by the Debtor of certain of its assets to Jeannette Industries, Inc. (Industries); and

IT APPEARING that Industries has withdrawn its offer to purchase said assets, as a result of which Debtor has notified the Court of its intent to withdraw the pending Plan of Reorganization and Disclosure Statement; and

IT APPEARING that various items in connection with the administration of this case have been deferred, pending the submission of the Plan of Reorganization to Creditors; and

IT FURTHER APPEARING that as a result of the withdrawal of the pending Plan of Reorganization, the administration of the within case should proceed with all deliberate speed;

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. That leave be and hereby is granted to the Debtor to withdraw the pending Plan of Reorganization; and the same is hereby deemed withdrawn; and that the objections to the adequacy of the Disclosure Statement are thereby rendered moot and the hearing on said objections is cancelled.

2. James Moody, is hereby appointed Trustee of Jeannette Corporation. The Trustee's powers shall be limited, until further Order of this Court or as provided herein, to the conducting of the sales of the assets hereinafter described. The officers of Debtor shall continue to operate its business subject to review by the Trustee.

3. That the Trustee is directed to conduct a public sale of all the Jeannette Glass Division's assets, including but not limited to: real estate, leasehold interests, machinery, equipment, inventory, moulds, dies, deposits, pre-paid expenses, accounts receivable, notes receivable due Jeannette Corporation and/or non-operating subsidiaries, books, records, customer lists, trade marks and trade names, under the following terms and conditions:

(a) That the sale shall be held on or before September 30, 1983.

(b) That the minimum price for said assets shall be $2,000,000.00. Credit shall be given to successful purchaser for accounts and notes receivable collected after the date hereof.

(c) That the sale shall be free and divested of all liens and encumbrances, including union contracts.

(d) That at confirmation the successful bidder shall deposit with the Trustee cash or certified funds in the amount of 10% of the successful bid.

(e) That such deposit shall be forfeited in the event the successful bidder fails to close pursuant to the terms and conditions of the sale.

(f) That closing on said sale shall be held within thirty (30) days after confirmation.

(g) That notice of sale shall be published in the Wall Street Journal, The Pittsburgh Press, The Pittsburgh Legal Journal, and Home Furnishings Daily.

(h) That within ten (10) days after this Order, the Trustee shall file a Complaint in proper form for the sale of the above assets free and clear of all liens and encumbrances.

4. In the event the Trustee fails to conduct such sale by September 30, 1983, his appointment shall be revoked, and a new Trustee appointed, unless the sale is postponed for reasons beyond the Trustee's control.

5. Until December 31, 1983, the Trustee shall permit the officers of the Debtor to operate Debtor's wholly owned subsidiary Royal China, Inc. (Royal) in the normal course of business with the proviso, however, that no unusual or extraordinary expenses shall be authorized without approval of this Court and that Royal shall not increase its administrative salaries or expenses beyond the level now extent.

6. The Trustee is hereby authorized and directed to solicit offers for the stock

and/or all underlying assets of Royal, provided, that the minimum price to be realized, after paying and/or assuming the liabilities of Royal, must be at least $500,000.00.

7. That the Trustee is directed and authorized to attempt to effectuate an agreement with both Coca-Cola Bottling Company of New York, Inc. and Pension Benefit Guaranty Corp. to release the Royal assets from their respective claims, transferring such claims to the proceeds realized from any sale of Royal.

8. In the event that by December 31, 1983, such releases are unable to be obtained, this Court shall entertain Motions to consider whether the Trustee shall be directed to file a Voluntary Chapter 11 Petition for Royal under Chapter 11 of the Bankruptcy Code in this jurisdiction, to be consolidated with this case.

9. That at any such sales held, the Court hereby authorizes the Trustee to accept bids from corporations or other entities organized by shareholders, officers and/or directors, etc. of the Debtor; provided, that such bids are in the minimum amounts as established above; the Court herein finds that such entities are qualified to bid on and/or ultimately purchase the assets of the Debtor; and that there is no impropriety or disqualification in former shareholders, officers and/or directors attempting to purchase such assets provided third parties are given fair opportunity to purchase the same at a public sale.

10. That pending the sale of the Royal assets or Royal stock by the Trustee, the Trustee shall have full and complete access to all books and records of Royal provided however, the Trustee shall not unreasonably interfere with Royal's business operations.

11. That as of January 1, 1984, the Trustee's powers shall be enlarged to include all rights, powers and duties granted to a Trustee under the Bankruptcy Code.

12. That the Application of the Committee of Unsecured Creditors to Engage Co-counsel and have Standing to Sue are hereby approved; and that a confirming Order shall be entered upon presentation of same by the Committee of Unsecured Creditors and/or its counsel. The Trustee is deemed to have joined in the Application to Engage Co-counsel, and shall join the Committee of Unsecured Creditors as co-plaintiff in the actions contemplated in the Application for Standing to Sue.

13. That the Court finds that it is premature to approve the Application for Administrative Compensation filed by Campbell and Levine, Attorneys for the Creditors' Committee, before a date is set for a hearing on application for compensation for all professional fees. However, pending such hearing, the Court directs the Debtor to pay an interim allowance to Campbell & Levine, Attorneys for Unsecured Creditors' Committee, of $20,000.00, plus costs of $1,722.43. Such interim allowance shall be credited against any fee applications subsequently approved.

/s/ Gerald K. Gibson
Gerald K. Gibson

The above Order is hereby stipulated and consented to:

/s/_____
Douglas A. Campbell, Esq.
Campbell & Levine
Counsel for Creditors
Committee

/s/_____
Sanford M. Lampl, Esq.
Lampl, Sable & Makoroff
Co-counsel for Jeannette
Corporation, Debtor"

It should be noted that this Order of July 27, 1983, set out in full above, appointed James Moody, as Trustee for the Debtor and directed the said James Moody to join in the "fraudulent conveyance" litigation now before this Court, (C.A. No. 83–2383) which was later filed on September 22, 1983. (See paragraph 12 of the above Order, Bankruptcy Docket Entry No. 165, Appendix Document No. 2)

Additionally, and above noted, this Order of July 27, 1983, required the Debtor to withdraw all pending Plans of Reorganization. (See paragraph one of the Order, Bankruptcy Docket Entry No. 165, set out above in full, Appendix Document No. 2)

By this Order (Paragraph one) the Bankruptcy Court ordered that the "Fourth Plan" of Reorganization "is hereby deemed withdrawn":

As noted above, paragraph 12 of the above Order of July 27, 1983, directs that:

"12. That the Application of the Committee of Unsecured Creditors to Engage Co-counsel and have Standing to Sue are hereby approved; and that a confirming Order shall be entered upon presentation of same by the Committee of Unsecured Creditors and/or its counsel. The Trustee is deemed to have joined in the Application to Engage Co-counsel, and shall join the Committee of Unsecured Creditors as co-plaintiff in the actions contemplated in the Application for Standing to Sue".

The Bankruptcy Docket Entries confirm that no suggested confirming Order ever was filed subsequently to the same, as required by this Consent Order of July 27, 1983.

The next day, July 28, 1983, the Bankruptcy Judge was presented with the same suggested Orders that had been addressed earlier to the United States District Judges and which had been refused by District Judge Cohill. (See Bankruptcy Docket Entries numbered 100, 101, 153) wherein a 33% contingent fee agreement (Docket Entry No. 100) was suggested and wherein Standing to Sue by the Committee of Unsecured Creditors was suggested. (Docket Entry No. 101) (See Appendix Document Numbers 2, 3, 4 and 34)

There is absolutely nothing in the record to even suggest that any of the interested parties (other than Douglas Campbell, the attorney for the Unsecured Creditors Committee) consented to or were even aware of Judge Gibson's Contingent Fee Order of July 28, 1983, until after it was entered. Said suggested contingent fee order of July 28, 1983, was certainly not the "confirming order" required by Judge Gibson's Order of July 27, 1983. As noted earlier in this factual narrative, the "contingent fee order" signed by Judge Gibson on July 28, 1983, was not even addressed to Judge Gibson. Said suggested Order already had

been addressed to and refused by the United States District Judge Cohill. (See Bankruptcy Docket Entry No. 100 and 101, Appendix Document Numbers 3 and 4) Further, said "Contingent Fee Order" was never time-stamped by the Bankruptcy Clerk and was never mailed to interested parties. The "Contingent Fee Order" reads as follows:

"IN THE UNITED STATES
BANKRUPTCY COURT

FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

IN RE:

JEANNETTE CORPORATION,

t/a JEANNETTE GLASS,

Debtor

Chapter 11

Case No. 82–3265

ORDER

AT PITTSBURGH, in said District, this 28th day of July 1983, upon consideration of the foregoing Application of Committee of Unsecured Creditors to the District Court to Engage Co–Counsel, it is hereby ordered, adjudged & decreed that the Committee of Unsecured Creditors be and hereby is granted leave to engage the law firms of Campbell & Levine and Mansmann, Cindrich & Huber as its legal counsel to pursue the litigation and issues arising out of the Royal China Transfer and the alleged Fraudulent Transfer referred to in said Application, on the following basis:

a. A Contingent fee of 33% of any and all funds recovered by them while pursuing the litigation and issues arising out of the Fraudulent Transaction and/or the Royal China Transfer;

b. Reimbursement of any and all out-of-pocket direct expenses and costs incurred by them while pursuing the litigation and issues arising out of the Fraudulent Transaction and/or the Royal China Transfer; but

c. Subject to the provisions of 11 U.S.C. § 328, that the Court may allow compensation on a different basis if such terms and conditions prove to have been improvident in light of developments not anticipated at the time of fixing such terms and conditions.

/s/ Gerald K. Gibson"

According, to the Trustee's assessment, the "fraudulent conveyance" case has the potential to generate almost 36 million dollars, which gives the attorneys Campbell and Levine and Mansmann, Cindrich and Huber the potential to receive a twelve million dollar legal fee if interest on the delayed receipt of damages is included in the recovery.

At the time of the entry of the "Contingent Fee Order" by Judge Gibson, on July 28, 1983, there was a cash balance of $1,615,492.42, in the bankrupt debtor's account, and by April 8, 1987, (See Bankruptcy Entry No. 553, Appendix Document No. 36) there was $2,210,000.00, in cash in the bank. The cash balance on the 31st of October 1986, was $2,192,691.90. (See Bankruptcy Docket Entry No. 446, Appendix Document No. 24)

As of October 7, 1987, Campbell and Levine have claimed fees in these cases in the amount of $341,515.70, and have received at least $195,471.47, on their account plus $3,162.31 in expenses. (See Appendix Document No. 25)

As of October 7, 1987, Mansmann, Cindrich and (Huber) (Titus) have received in expenses *only* in the "fraudulent conveyance" litigation the sum of $141,793.88. (See Appendix Document No. 25)

The Debtor's Trustee, James Moody, and his accounting firm as of October 7, 1987, have claimed $323,942.85, and have received $243,383.15, on their account. (See Appendix Document No. 25)

The total claimed professional fees and professional expenses to October 7, 1987, in this case amount to over one million dollars. (See Appendix Document No. 25)

The Debtor has taken exception to the amount of fees and expenses charged by the Trustee and his attorneys. (See Bankruptcy Docket Entry No. 1321, Appendix Document No. 26)

On the other hand, the Debtor's attorneys have received fees of at least $235,000, (See Appendix Document No. 25) and the Trustee has taken exception to the payment of these fees. (See page 12 of Appendix Document No. 6 as follows:)

"Also pending is the Trustee's Motion to have the attorneys who represented the Debtor in this case return the approximately $235,000 they were paid from the estate—primarily by the Debtor-in-Possession—on the grounds that they violated their duty of loyalty to the estate and its creditors by seeking to protect the adverse interests of J. Corp./J.P. Brogan while nominally representing the bankruptcy estate."

On July 30, 1986, Moody, the Debtor's Trustee, filed the "Fifth Plan of Reorganization" in this case. This "Chapter 11 Plan" is admittedly a plan for the liquidation and distribution of all of the Debtor's assets. (See page 25 of the Trustee's Disclosure Statement, Bankruptcy Entry No. 374; Appendix Document No. 6)

At Page 18 of said Trustee's Disclosure Statement, (Appendix Document No. 6) the Trustee states in regard to the "fraudulent conveyance litigation" that, "a seven figure settlement offer has already been made by the dependents, (sic defendants) but was refused."

It is to be noted, that prior to the Trustee's and Trustee's Attorneys' refusal of the "seven figure settlement offer," there was no presentation of the settlement offer to the Unsecured Creditors for their consideration and/or rejection or approval, and there was no hearing scheduled or presentation of the offer of settlement to the Bankruptcy Court for its consideration and/or approval.

Attorney Campbell at the December 9, 1986, Bankruptcy Court hearing on the Trustee's motion to approve the Trustee's Reorganization and Trustee's Disclosure Statement, said the following:

"Sure, we're on a contingent fee. But if we didn't—our interests are consistent

with the creditors, and that's one thing the debtor's counsel can't say. They represent the defendants in that litigation. If we thought that $1,250,000.00 was what the case was worth, we'd settle it for $1,250,000.00, but it's worth far more than that. And I can say that because I have a vested interest in the outcome. I have a big interest in that case. One third of $1,250,000.00 is nothing to sneeze at. And if I thought that that was anywhere near ballpark, I'd seriously entertain it. But I consider it an afront. It's not a serious offer. It's an attempt to pull one over one over on the creditors, and I think that's indicated by the fact that they put—part of this program was to consider, hurry up and give away your rights; this limited offer expires on December 31, 1986".

The next day, December 10, 1986, after the above-mentioned of Attorney Campbell, the Trustee's attorney, the Debtor's attorney, Sanford M. Lampl, sent an unfiled letter to the Bankruptcy Judge Markovitz (with a copy to Attorney Campbell) and assured the Judge that the offer of settlement in the amount of $1,250,000.00, would remain in full force until the creditors were given a chance to vote on said offer of settlement. (See the Lampl letter offer of settlement, Appendix Document No. 17)

In response to the charge of the Debtor's attorneys, that the Trustee was concealing the details of the offer of settlement, (which offer the Trustee and his Attorney Campbell had already refused without the knowledge and/or consent of the many Unsecured Creditors) said Trustee suggested a supplement to the Trustee's Disclosure Statement, by offering to inform the Unsecured Creditors about the fact that an offer to settle the "fraudulent conveyance litigation" for $1,250,000.00, had been made to the Trustee, however, the Unsecured Creditors were not given an opportunity to approve said settlement offer for the reason that said offer of settlement had already been rejected by the Trustee and Trustee's attorneys. (See Bankruptcy Docket Entry No. 447; Appendix Document No. 7, and Bankruptcy Docket Entry No. 374; Appendix Document No. 6, at

Page 18) (See also Page 43 of the hearing transcript of December 9, 1986, where Attorney Campbell readily admits that he has a vested personal financial interest in the outcome of the litigation and that he, Attorney Campbell was admittedly motivated by personal financial considerations when he unilaterally rejected the defendant's offer to settle the "fraudulent conveyance litigation" for $1,250,000.00, without advising or consulting with the Unsecured Creditors who are the real parties in interest)

On November 10, 1986, the Debtor, Jeannette Corporation filed a "Sixth Plan of Reorganization" along with a Disclosure Statement. (See Bankruptcy Docket Entries Nos. 418 and 419; Appendix Document Nos. 9 and 10)

On pages 2 and 26 of the Debtor's Disclosure Statement, (See Bankruptcy Docket Entry No. 418; Appendix Document No. 10) it is acknowledged that both the Debtor's Plan (Sixth) and the Trustee's Plan (Fifth) require a liquidation of all of the Debtor's assets and the ultimate result of both plans is quite similar to what would happen in a Chapter Seven Liquidation. It is an undisputed fact, that both the Trustee's Plan of Reorganization and the Debtor's Plan of Reorganization contemplate the complete liquidation of all of the Debtor's assets and that there is absolutely no chance and/or hope that the Debtor will be rehabilitated.

At page 2, of the Debtor's Disclosure Statement (Appendix Document No. 9) is the following:

"The Debtor's plan is one of two plans pending before the Court. The essential difference between the two plans is that the Debtor's plan would guarantee payment of $1,250,000 to the estate for satisfaction of claims (in settlement of the Trustee's lawsuit against various parties), while the Trustee's plan would continue that lawsuit to a conclusion, so that no return to creditors will occur unless the Trustee wins the lawsuit and collects a judgment. The Debtor expects that the Settlement Sum of $1,250,000 could, based upon the Trustee's own "conserva-

tive estimates" provide for payment of 15%–20% on creditors general unsecured claims totaling approximately $6,000,000 to $8,000,000—before allowing for sums that might be allowed to the Trustee's counsel in the District Court Litigation. See p. 14, infra. An allowance of 33⅓% of the Settlement Sum to such counsel could reduce the dividend to approximately 10%."

Additionally, at page 26, of said Debtor's Disclosure Statement, (Appendix Document No. 9) is the following:

"There can be no distribution to unsecured creditors in a Chapter 11 without a confirmed Plan of Reorganization. Because the Plan essentially provides for the liquidation of all the Debtor's assets and the distribution of the proceeds, it is quite similar to what would happen in a Chapter 7 liquidation."

On November 25, 1986, Debtor's attorney moved for an expedited hearing for the approval of Debtor's Disclosure Statement, (See Bankruptcy Docket Entry No. 428; Appendix Document No. 15) and on December 2, 1986, Douglas Campbell, the Trustee's attorney filed objection to said motion for an expedited hearing. (See Bankruptcy Docket Entry No. 430) The following day, December 3, 1986, Debtor's attorneys, Lampl and Pappone, did the following:

(a) Moved the Bankruptcy Court to approve the Debtor's Disclosure Statement; (See Bankruptcy Docket Entry No. 431, Appendix Document No. 11)

(b) Debtor's attorneys filed their objections to the Trustee's Disclosure Statement; (See Bankruptcy Docket Entry No. 432, Appendix Document No. 8) and

(c) Debtor's attorneys evidently filed a copy of a proposed Debtor's Amended Disclosure Statement and distributed the same to the attorneys of record. (See Appendix Document No. 12) [Note: The Debtor's Amended Disclosure Statement (the Seventh Disclosure Statement filed in this case) was found in the Bankruptcy Court files, (See Appendix Document No. 12) but there is no Docket Entry number assigned to this document. However, the Employee Creditors filed an objection to this Debtor's Amended Disclosure Statement (Appendix Document No. 12) and referred to it as though it properly had been filed of record. (See Bankruptcy Docket Entry No. 519, Appendix Document No. 13) ]

In the meantime, by an Order dated November 4, 1986, (See Bankruptcy Docket Entries Numbers 413 and 424, Appendix Document No. 14) the Bankruptcy Judge set December 9, 1986, as the date for a hearing on the Trustee's Disclosure Statement, but the Bankruptcy Judge without any plausable explanation refused to hear the matter of the Debtor's Disclosure Statement on the same day, (i.e. December 9, 1986) although said Bankruptcy Judge was formally requested to do so on two separate occasions.

The Debtor's motion and very reasonable request for a hearing on its Disclosure Statement on December 9, 1986, at the same time as the hearing on the Trustee's Disclosure Statement was to be held, reads as follows:

"3. On or about October 15, 1986, the Trustee filed a proposed Disclosure Statement and pursuant to Order dated November 4, 1986, a hearing on the Trustee's Disclosure Statement is currently scheduled for hearing on December 9, 1986 at 11:00 a.m.

4. On or about November 5, 1986, Debtor filed its own Disclosure Statement and as of November 25, 1986, no hearing has been scheduled by the Court in connection therewith.

5. In the interest of judicial economy and in order to avoid any confusion among creditors with respect to the competing Disclosure Statements and Plans, a hearing in connection with the Debtor's proposed Disclosure Statement should be simultaneously held with the hearing on the Trustee's Disclosure Statement so that solicitation and balloting can be coordinated and costs and confusion kept to a minimum.

6. There will be no prejudice to creditors and other parties in interest by the holding of an expedited hearing on Debtor's proposed Disclosure Statement.

WHEREFORE, Debtor respectfully prays that this Honorable Court hold a hearing in connection with Debtor's Disclosure Statement on December 9, 1986 at 11:00 a.m. or as soon thereafter as suits the convenience of the Court together with such other and further relief as may be just and proper."

As heretofore noted, the Bankruptcy Judge, without offering any plausible reason or explanation, refused to hear about the legal efficacy of the Debtor's Disclosure Statement which set forth the view contrary to that of the Trustee to the effect that the "fraudulent conveyance" litigation possibly could be lost by the Trustee; that the defendants in said litigation had alleged reasonable and legally viable defenses to the Trustee's claims of "fraudulent conveyance" in said litigation; and that an offer to settle this "fraudulent conveyance" litigation for $1,250,000.00, should be seriously considered by the "Unsecured Creditors" when and if they cast their votes for or against the two competing Reorganization Plans.

In passing, it might be noted that this District Court delayed the trial of this "fraudulent conveyance" litigation for a long period of time in order to be guided by the result in the "Gleneagles" case, which has some similarity to this case at bar and was also involving a leveraged buyout transaction and alleged violations of various sections of the Pennsylvania Fraudulent Conveyance Act.

"See 803 F.2d 1288 (3d Cir.1986). The Gleneagles cases are: *United States v. Gleneagles Inv. Co.*, 565 F.Supp. 556 (M.D.Pa.1983) (Gleneagles I); *United States v. Gleneagles Inv. Co.*, 571 F.Supp. 935 (M.D.Pa.1983) (Gleneagles II); *United States v. Gleneagles Inv. Co.*, 584 F.Supp. 671 (M.D.Pa.1984) (Gleneagles III); and *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), cert. denied sub nom. *McClellan Realty Co. v. United States*, — U.S. ——, 107 S.Ct. 3229 [97 L.Ed.2d 735] (1987). For the sake of convenience the cases will be jointly referred to as Gleneagles."

This Gleneagles case was not concluded until June 22, 1987, some months after the last two competing Plans of Reorganization had been filed by the Trustee (the Fifth Plan filed) and by the Debtor (the Sixth Plan filed) (See Appendix Documents Nos. 5, 6, 7, 9, 10 and 12) and after four issues had arisen in this Bankruptcy case,

(a) concerning the Bankruptcy Court's approval and/or disapproval of the competing Disclosure Statements;

(b) concerning the necessity of submitting the settlement offer to the Unsecured Creditors for their approval;

(c) concerning the issue as to whether some 16 million dollars to 18 million dollars of claims of former active and retired employees were time barred; and,

(d) concerning the issue whether this entire bankruptcy matter should be converted from Chapter 11 to Chapter 7 of the Bankruptcy Code. (the fourth issue is now being considered by this District Court)

Because of these four above-mentioned issues were outstanding and unresolved both prior to and after the Gleneagles decision and up to the date of this very opinion and order of this court now being written by this District Court regarding the fourth issue, and despite the claims, assertions and demands of the plaintiffs' attorneys for an immediate trial, this "fraudulent conveyance" litigation could not have been brought to trial legally, fairly and properly until these above-mentioned four issues were resolved in some manner by this District Court. [ (See the motion of the Trustee to the District Court dated July 10, 1987, for an Order setting a trial date) (See "fraudulent conveyance", Civil Action Docket No. 83–2383, Entry No. 393; Appendix Document No. 27); See also defendant's response to that motion addressed to the District Court requesting a trial date, "fraudulent conveyance", Civil Action Docket No. 83–2383, Entry No. 394, Appendix Document No. 28; and See also Trustee–Plaintiff's motion to the District Court requesting a status conference "fraudulent conveyance", Civil Action Docket No. 83–

2383, Entry No. 399; Appendix Document No. 29) ]

On December 9, 1986, and as above-noted, the Bankruptcy Judge held a "Disclosure Statement hearing" *only* on the Trustee's statement and said Bankruptcy Judge refused to address the legal efficacy of the Debtor's Disclosure Statement, although requested to do so on two prior occasions.

The entire transcript of said Bankruptcy Court hearing of December 9, 1986, is set forth as Appendix Document No. 16; See also Bankruptcy Docket Entry No. 461.

However, for the convenience of this District Court, the following portions of the December 9, 1986, Bankruptcy Court hearing for the Trustee's Disclosure Statement are set forth in these factual findings as follows: *Mr. Pappone at pg. 29 of transcript:*

"What we have here is a rather uncharacteristic activity on the part of the Trustee that theoretically should want to get this matter forward; should theoretically want to get the ratification of his desire to go forward with that litigation by the creditors, and that can only happen if they're given the choice. And that's what we're trying to do today.

"As far as delays are concerned, I think the record should reflect that our Plan was sent into Court on November 7th before, in fact, the mails possibly could have caused the November 4th Notice of the Trustee to reach me in Boston. And, yes, our Plan was a response to the Trustee's Plan, but it was not a response that was artificially delayed to take advantage of any kind of a scheduling game. Indeed, my cover letter on my Plan pleads with the Court to set them down for the same time. And I appreciate, because I read the Wall Street Journal on the plane this morning here that the dockets of bankruptcy courts are crowded and we've got a lot of problems. It's the front page story. One can't really live in a cocoon concerning that. But there really is time to give the creditors side by side choice of whether to go hell bent for election or pursuit of the District Court litigation or to accept $1,250,000.00 in settlement of that litigation. And the prece-dent of embodying settlements of litigation in reorganization plans is well founded. Continental Mortgage Investors was a three quarter of a billion of a dollar real estate investment trust, and settlement of the senior creditors claims to that fund were settled in the context or pre-planned activity and further in connection with an ultimate Plan of Reorganization. So there's nothing really wrong with that. In fact, it's the most expeditious way to get money to the civilians. And that's all we're really looking for here today. In fact, if the Court were to agree to get our disclosure statement on for prompt approval, let the people file whatever objections they want. And, by the way, Mr. Campbell has had it since we filed it with the Court, it went to him simultaneously by hand, if I remember correctly. There was no five day delay in submitting it to him after it was filed with the Court. No attempts to keep secrets here. That would give the creditors the opportunity to make their choice, and it would render a little less crucial some of the otherwise well founded objections that I have to make to his disclosure statement. And, frankly, I would move now for a continuance of this matter until my disclosure statement can be properly noticed out by the same mailing matrix as Mr. Campbell's and give Mr. Campbell the opportunity that is now 30 days old for him to file objections to it or to engage me in some kind of combat over what he thinks it ought to say to be more accurate or more helpful to creditors making a choice. But, frankly, I think that both of our disclosure statements read a little bit like an argument in favor of a plan, and they probably should. And taken together you probably don't have to fine tune them too awfully much. I do have my objection to his. I'm sure he's going to have his objections to mine. But between the two, they go out together, the creditor is going to be able to read one, he's going to be able to read the other, he's going to see that a substantial portion of the debtor's plan mirrors and aids Mr. Campbell's clients' plan word for word, number for number, and it comes down to one essential difference, which I just can't stress enough as being the only

sensible way for us to handle the overall wrap up of this otherwise and heretofore chaotic case. I wonder if the Court would like to consider that in terms of the time frame we're looking at here.

"THE COURT: I want to hear your other objections as well.

"MR. PAPPONE: Okay, fine. I'll go straight to those. I really don't think that in all candor—

"THE COURT: Well, you're saying that we should somehow or another prepare a new document incorporating the two disclosure statements, bringing the additional fact that should maybe go to the creditors is that there's an offer on the table of $1,250,000.00 and maybe give them the option of saying go forward with the litigation or don't go forward, settle or—

"MR. PAPPONE: If you'll permit me, I'm saying the exact opposite.

"THE COURT: I'm sorry.

"MR. PAPPONE: I said, his disclosure statement now more or less as it is, let stand the debtors disclosure statement now more or less as it is—

"THE COURT: I don't see that a normal reasonable everyday creditor is going to be able to read two such novels. I think if anything, it's going to put them to sleep.

"MR. PAPPONE: Judge, please believe me, there's no way on God's Green Earth that you're going to, other than writing it yourself, get a disclosure statement that represents a meeting of the minds of these two sides in this courtroom. This battle has been going on for four very bitter years. The only sensible way to do it is to just cut it and let the chips fall where they may. It's very easy in a summary letter to say that basically one plan provides for a settlement to that litigation and you give up your chance to go for the gold and the 100 cents on the dollar, and the other one gives you a settlement. Let us know whether you can live with it. It's very simple. Whether a creditor needs to wade through all those pages to get to that bottom line, I don't know. But I do think that if you're giving somebody a choice you have to give both sides' arguments in favor

of why they ought to take that choice. Mr. Campbell argues he's got a good case, solid District Court litigation. They ought to go with him because he's got precedent. The debtor is saying the facts aren't similar at all, there's never going to be a meeting of the minds, it's going to get appealed, it's going to go on for a substantial period of time because you've got very well financed, very well heeled counsel for each one of the defendants of that litigation. I think you have to let both sides tell their story. I honestly feel that it would be wrong to cut either side off from having the opportunity to, if you will, make their pitch to the creditor body out there. I think you need two disclosure statements, and whether somehow or another we can spend a lot of legal time for a result that maybe you'd have a common position and you'd have a three or four page advocacy piece that went along with the common position, it's up to the Court. Maybe something like that is possible, but you've got clocks ticking here at the expense of those creditors. They've already spent a substantial amount of time on this disclosure statements. I really question whether it makes sense to compensate Mr. Campbell and the other several attorneys in his firm who are here with him today to rewrite it in such a way that it's appropriately sanitized and maybe loses the punch that they originally wanted to have. As Mr. Campbell knows, as the Court is well aware, I'm being compensated by outside forces, indeed accurately stated and being—the estate doesn't have money to pay another debtor's counsel, frankly, what it boils down to. And I'm simply not willing to work on a contingency before the Court with respect to that. And I undertook the engagement to get this other side of the story told on behalf of the debtor by the debtor's principals and by its major shareholders, who coincidentally, let there be no secret, happen to be defendants in District Court litigation. And I'm perfectly willing to let my disclosure statement and any materials that go out with it reflect that I'm being compensated for doing this work not out of the goodness of the Court's heart or any recognition under 503(b)' 3D concerning substantial contribu-

tions to the estate, but by people who have an axe to grind concerning moving this estate along and getting an opportunity to the creditors to choose. I don't know who can speak for the debtor, but those chosen by its principals and by its shareholders to speak for it. And I'm not here to keep any secrets concerning who they are or what they're paying me. And I've had no problem saying that in the disclosure statement. I have no problem with the creditors having that as an overall gloss to the perspective from which I'm making my argument. The same way that Mr. Campbell has no secret that he's out there gunning for a 33 and ⅓ percent contingency fee, which could make a person very comfortable if it could be held.

"THE COURT: So you're proposing two disclosure statements with two letters, a letter attached to each disclosure statement, and somehow have a ballot prepared wherein the parties can decide which way they want to go.

"MR. PAPPONE: Exactly, I've done it before, Your Honor. I'm not inventing anything new here. I mean it's nice. The ballot says, do you want a Plan A or Plan B, or do you want to elect to vote for both of them and then give your preference.

"THE COURT: And each side in their disclosure statement can put forth their best possible foot, you know, say what they want to say about their position, say what they want to say about the other side's position.

"MR. PAPPONE: Absolutely.

"THE COURT: Then allow the creditors to decide whether this case goes forward there or does not.

"MR. PAPPONE: Exactly. It's certainly possible. I just try to conceive of all the horrible hypotheticals we were trained to think of in our first year of law school. It's possible they reject both plans. And then we probably have to come up and say, well, maybe one million two-fifty isn't good enough. We had a pretty good response, let's say, to a million two-fifty but it was a few votes short. Let's find a way to sweeten it up just enough to get those votes, and I'll go back to those defendants and I'll

say, fellows, if you want to sell this to the creditors it's going to cost you more, and we want that money and we're going to notice the thing out again and I'll try to sit down with Mr. Campbell and his side, and once those votes are tallied up and he sees which way the winds are blowing—this is purely, you know, this is total speculation. If he sees that the winds are blowing fairly strongly in favor of a settlement in that range, maybe that's where we go and wrap this up. But at that point additional negotiations could take place.

"With respect to getting a Plan confirmed so priority payments could be made, let the debtor's position be very clear on that. The debtor claims none of that money. Debtor's counsel probably, who is being compensated only by out of the funds of the estate, Mr. Lampl's office, probably would like to see some of the Chapter 11 expenses taken care of. I have no problem scheduling an Order for the payment of priority claims to these people. Let's have a time frame within which to object to claims, and let's pay the priorities out, and then let's simply notice out, holding the $130,000.00 or however much Mr. Campbell thinks is necessary for unallowed counsel fees, we'll have a plan where everybody is out of the way except the general unsecured creditors. (*underlining supplied*)

"THE COURT AT PG. 42, LINE 9, OF THE TRANSCRIPT:

"THE COURT: How do you respond to the argument that the parties ultimately voting on this Plan should know about this offer of $1,250,000.00 and maybe have the option of saying enough of that, we'll take twenty cents on the dollar?

"MR. CAMPBELL: The offer expires on December 31st, 1986. It will be gone before anybody could have it.

"MR. PAPPONE: I think this offer might be extended. Just need some kind of a sign, Judge. Let's let the creditors decide that. (NOTE: Attorney Lampl letter of 12/10/86 making unequivocal and extended offer to settle the "fraudulent conveyance case" for $1,250,000.00. See Appendix No. 17).

"MR. CAMPBELL: Well, it expires on December 31st, 1986 by its terms, and I haven't see—I haven't seen anything that binds anybody to honor it even if it's extended. I don't know who is putting up this money. What is it? What's the source for funding of this Plan? It's pretty vague. It's about as vague as Mr. Pappone's description, original description of the source of his compensation in this case, affiliates of the debtor or something. What are we going to get next, a notice of intent to amplify a source of funding the Plan. It's the same pattern over and over again. We're ready to go with the Plan that does exactly what he describes that takes care of all the priority stuff. And then we go off and we'll take care of the litigation. Sure, we're on a contingent fee. But if we didn't—our interests are consistent with the creditors, and that's one thing the debtor's counsel can't say. They represent the defendants in that litigation. If we thought that $1,250,000.00 was what that case was worth, we'd settle it for $1,250,000.00, but it's worth far more than that. And I can say that because I have a vested interest in the outcome. I have a big interest in that case. One third of $1,250,000.00 is nothing to sneeze at. And if I thought that that was anywhere near ballpark, I'd seriously entertain it. But I consider it an afront. It's not a serious offer, its an attempt to pull one over one over on the creditors, and I think that's indicated by the fact that they put—part of this program was to consider, hurry up and give away your rights; this limited offer expires on December 31, 1986. I think that gives us all a pretty strong indication of the quality, the character of this offer, whoever is making it. We don't even know, your Honor. And then if we go through, you know, the particular objections they concocted to the disclosure statement, you can see what the motive was here. It was just to throw something up to delay the process. It's become frustrating, this case, to the Trustee and to his counsel. But we're going to persevere. And we've got—our time has come to put out something to the creditors and let them see if they want it. There's no offer here. It expires and no one has told us where it's coming from, and no one has bound themselves to honor that.

"If you'd like, your Honor, I can go through their objections. I think it may cast some light on just where the debtor is coming from again. It's all illusions." (*underlining supplied*)

On December 18, 1986, the Bankruptcy Judge wrote a Memorandum Opinion and Order which approved the Trustee's Disclosure Statement and said Bankruptcy Judge ignored the Debtor's Disclosure Statement although it realistically addressed the deficiencies in the Trustee's "fraudulent conveyance" case, and said Bankruptcy Judge especially ignored and did not discuss the fact that the Trustee and his attorney, Douglas Campbell, unilaterally, (and without any discussion and/or input from the Unsecured Creditors and without any hearing on the subject of settlement before the Bankruptcy Judge) had completely rejected the defendant's offer to to settle the "fraudulent conveyance" case for $1,250,-000.00, and in a situation where Attorney Campbell would have a difficult time in giving his client, the Trustee, objective and dispassionate advice after he, Campbell openly admitted on the record to a very great personal and immediate vested financial interest in the outcome of said "fraudulent conveyance" litigation. (See underlined exerpts from the transcript (Appendix Document No. 16) set forth above in this factual history) (See also this Memorandum Opinion of the Bankruptcy Judge, Bankruptcy Docket No. 448; Appendix Document No. 18)

On December 22, 1986, the Debtor appealed to this United States District Court, the order and decision of the Bankruptcy Judge approving the distribution of the Trustee's Disclosure Statement to all of the parties in interest. (Especially all Unsecured Creditors) (See Bankruptcy Docket Entry No. 453; Appendix Document No. 19)

On January 14, 1987, this United States District Court withdrew the reference from the Bankruptcy Court as to all matters pertaining to the Trustee's Disclosure

Statement and Plan of Reorganization and as to all matters relating to the Debtor's Disclosure Statement and Plan of Reorganization, and the Bankruptcy's Judge's Order of December 18, 1986, was stayed. (See Appendix Document No. 18, Bankruptcy Judge's Order) (See also Civil Action No. 87–268, related to Civil Action No. 83–2383, "fraudulent conveyance" litigation; Appendix Document No. 20)

On February 2, 1987, Attorney Beard filed a motion on behalf of the Unsecured Active and Retired Employees to convert the Bankruptcy case from Chapter 11 to Chapter 7. (See Bankruptcy Docket Entry No. 496; Appendix Document No. 22)

On March 10, 1987, this United States District Court withdrew the reference in regard to the Employees' Motion to Convert the Bankruptcy case from Chapter 11 to Chapter 7 of the Bankruptcy Code. (See U.S. Court Civil Action No. 83–2383, Docket Entry No. 385; Appendix Document No. 23), and this District Court in this Opinion is addressing said motion at this time.

This above-mentioned withdrawal of reference by this District Court's Order of March 10, 1987, as to the "conversions" issue was filed and acted on by this District Court, prior to the March 26, 1986, scheduled hearing to address the conversion issue in the Bankruptcy Court. (See Bankruptcy Docket Entry No. 514, entered on February 20, 1987, and the Bankruptcy Docket Entry filed on March 26, 1987, and numbered W/519, wherein a hearing in the Bankruptcy Court on the Motion to Convert was not held because the United States District Court had withdrawn the reference prior to the scheduled date of the hearing on said Motion to Convert)

The Trustee responded on January 6, 1988, to the Hourly Employees' Motion to Convert by filing a motion with the United States District Court to extend the "Bar Date" (i.e. the last day for filing claims against the Debtor) from October 31, 1983, (See Bankruptcy Docket Entry No. 97, entered March 31, 1983) to some appropriate time in the future in lieu of conversion to Chapter 7. (See C.A. No. 83–2383, Docket Entry No. 406; Appendix Document No. 31)

The "Brogan" defendants responded to the Trustee's Motion to Extend the "Bar Date" by opposing said motion in a "Joint Memorandum". (For a copy of the same See Appendix Document No. 32)

In their response at Page 2, to the Trustee's argument, that conversion would eliminate the Trustee and his counsel from the case (at least temporarily since the Trustee and his counsel could be reappointed by the United States Trustee if the case were converted to Chapter 7) the Brogan defendants respond that "... no attorney is worth retaining at the risk of opening up the estate to $16,000,000.00, of potential claims".

To date, the Debtor, Jeannette has scheduled 882 pre-petition unsecured trade creditors whose claims total $4,174,224.00.

In or about June 1983, PBGC (Pension Benefit Guaranty Corp.) filed certain claims (the "PBGC Claims") against the estate of Jeannette Corporation. Claim No. 428 is for $193,368; No. 429 is for $6,800,000; No. 430 is for $538,528, and No. 431 is for $126,884. ("PBGC Claims" are made by the Pension Benefit Guaranty Corporation)

Additionally, the former hourly employees of Jeannette have filed certain claims against the estate of Jeannette (the "Employee Cliams") in the amount of $579,-789.99, (Claim No. 549) and the amount of $396,000, (Claim No. 535). On October 26, 1987, new employee claims numbers 639 and 650 were filed after the bar date of October 31, 1983, in the amounts of $2,263,-785.62, and $14,949,661.96, respectively.

Proof of claim No. 640, filed by the Union on behalf of the 732 Active Employees in the total amount of $14,658,870.20, reflects total vacation pay claims of $675,-669.82, of which $169,241.53, constitute priority claims and the remaining $506,482.29, represent non-priority unsecured claims.

In passing it is well to note that of the 903 active employees only 698 are represented by Union counsel Attorney Beard, and have filed claims; 34 active employees

have filed claims but are not represented by counsel; and roughly 169 or 163 active employees are not represented by counsel and have not filed claims representing potential additional claims of approximately $3,000,000.00. (See Appendix Document No. 21)

Of 242 retirees only 39 failed to request representation by counsel. Again roughly 16% of the retirees have not filed claims representing potential additional claims of roughly $45,000.00. (See Appendix Document No. 21)

At present there are 2,027 potential individual claims of Unsecured Creditors (242 Retirees; 903 Active Employees; 882 Unsecured Trade Creditors) in the alleged but not verified amount of approximately twenty-three million dollars.

Additionally, Calvin D. McCracken, as Chairman of the Employees Committee, has filed general employee claims for loss of employment at Claim No. 586, for over twenty-nine million dollars. (See Bankruptcy Docket Entry No. 718, of April 9, 1987; Appendix Document No. 34, page 17)

In fact, since a sizable group of employees still have not presented their claims to the Trustee, (See discussion of this matter in the Opinion that follows this "factual statement", their additional claims could increase to over eighteen million dollars if the "bar date" is extended.)

In the light of these facts as above found by this District Court, this District Court must and will conclude for reasons set forth in the Opinion which follows, that in the interest of reducing much unnecessary expense of litigation; in the interest of expediting the conclusion and completion of the "fraudulent conveyance" litigation, and the liquidation of the Debtor's estate; in the interest of reducing the inordinate delay that has beset this "fraudulent conveyance" litigation and to reduce delay in the final distribution of the Debtor's assets; and above all in the interest of fairness and justice to all of the interested parties, this matter shall be converted from Chapter 11 to Chapter 7 of the Bankruptcy Code.

## CONCLUSIONS OF LAW

This Bankruptcy case, in Re: Jeannette Corporation, now filed under Chapter 11, of the Bankruptcy Code (The Corporate Reorganization Section) based upon the undisputed facts, should be converted to a Chapter 7 case (Liquidation Section) for the reasons hereinafter set forth in this Court's Opinion.

## OPINION

(NOTE: Because it is vital to the ongoing prosecution of this litigation, (in regard to converting this bankruptcy matter from Chaper 11 to Chapter 7, of the Bankruptcy Code) both in the Bankruptcy Court and in this District Court, that the enclosed Findings of Fact, Conclusions of Law and Order of this Court should be filed with the Clerk of the United States District Court immediately, this District Court's Opinion (which is very lengthy) in support of the aforementioned Order of this Court, will be filed with the Clerk of this District Court within fifteen (15) days of the date of this Order of Court which is attached hereto.)

## ORDER

AND NOW, this 15th day of MARCH, 1988, for the reasons set forth in the hereinafter filed Opinion of this Court, and after oral hearing, argument of counsel and briefs of counsel and after taking judicial notice of the record and the undisputed facts set forth in the Docket Entries and supporting pleadings, transcripts and orders both in this United States District Court and in the United States Bankruptcy Court, (See particularly the Two Volume Appendix attached hereto and made a part hereof by reference) IT IS THE ORDER OF THIS COURT, that the above-captioned bankruptcy matter shall be and is immediately converted from Chapter Eleven of the United States Bankruptcy Code, as amended, to Chapter Seven of the same.

Because the Committee of Unsecured Creditors has no standing to sue in the above-captioned "fraudulent conveyance litigation" filed in this District Court as Civil

Action No. 83–2383, and for the reasons to be set forth in the Opinion of this Court to be hereinafter filed at said Civil Action No. 83–2383, in support of this within Order, the Committee of Unsecured Creditors is removed as a Plaintiff in the above-captioned "fraudulent conveyance litigation"; further, the caption of said case (Civil Action No. 83–2383) shall be amended accordingly; further, the so-called 33% contingent fee order entered by the Bankruptcy Court, at Bankruptcy No. 82–3265, on July 28, 1983, is vacated ab initio and said "contingent fee agreement" shall not be given any legal force or effect whatsoever.

FURTHER, the Law Firm of Campbell and Levine and the Law Firm of Mansmann, Cindrich, Huber and Titus are removed as attorneys in this case as a matter of law because of the conversion to Chapter 7 and for reasons set forth in the hereinafter filed Opinion of this Court.

Because of the complexity of the above-captioned "fraudulent conveyance" litigation and because former counsel is very familiar with the same after almost five years of litigation, this District Court very reluctantly recommends that the Law Firms of Mansmann, Cindrich and Titus and Campbell and Levine be retained to conduct the "fraudulent conveyance" litigation. Further, this Court recommends that James Moody be retained as Trustee. However, these law firms and the Trustee shall be paid a reasonable fee on a hourly basis for necessary services rendered and they shall be strictly accountable for all money claimed or received for services rendered. Further, if attorneys' fees and/or expenses and costs are awarded in the RICO action in this case and/or for any other litigation claims, said lawyers shall reimburse Bankrupt Debtor for any moneys received so as to prevent said attorneys from receiving a double payment for expenses and/or services rendered. The Law Firms of Campbell and Levine and Mansmann, Cindrich and Titus shall not receive any legal fees for representing the Trustee in the above litigation until said litigation has been concluded. All fees heretofore billed to the Trustee Moody by Campbell and Levine for services rendered the Trustee Moody in regard to the "fraudulent conveyance" litigation shall be disgorged immediately and shall be returned by Campbell and Levine to the Debtor's estate.

FURTHER, every attorney and/or law firm of record in the United States Bankruptcy Case No. 82–3265, and in any of the above-captioned United States District Court cases shall file a minute and fully itemized accounting statement of all moneys received and/or claimed from the Bankrupt Debtor's estate, and/or of all money received from any client represented in all of these cases or related cases whether for services rendered and/or for money received for and/or in reimbursement for expenses or for services furnished by others for said Debtor but paid to said attorney by parties other than the Debtor.

FURTHER, the Trustee, James Moody, shall likewise file a minute and fully itemized statement for himself as Trustee and for his accounting firm of all moneys received and/or claimed from the Bankrupt Debtor's estate, whether for services rendered and/or for money received for and/or in reimbursement for expenses or for services furnished by others but paid for by the Trustee and/or his accounting firm.

These accounts as above-mentioned for legal services, accounting services and reimbursement for expenses incurred, shall be filed within sixty (60) days of the date of this Order.

An Opinion of this District Court in support of these Findings of Fact, Conclusions of Law and the within Order shall be filed with the Clerk of this Court within fifteen (15) days of the date of this Order.

## OPINION

### (March 29, 1988)

#### Introduction

*For four separate and distinct reasons, the underlying Bankruptcy case in this matter, No. 82–3265, should be converted from a Chapter 11, Reorganization Proceeding, to a Chapter 7, Liquidation Pro-*

*ceeding, pursuant to the Bankruptcy Code as amended.*

*Each of the reasons hereinafter set forth are separately sufficient cause to order the "conversion" of the within proceeding to Chapter 7.*

The Motion to Convert the underlying bankruptcy proceeding in the above-captioned case from Chapter 11 to Chapter 7, was filed by John Polojac and the American Flint Glass Workers Union of North America, Local No. 535 (hereinafter called "Union") in the United States Bankruptcy Court for the Western District of Pennsylvania, at Bankruptcy Case No. 82–3265, and Bankruptcy Motion No. 87–531, and the motion was withdrawn to this District Court by order of this District Court dated March 10, 1987. (See Appendix Document No. 17, United States District Court, Civil Action No. 83–2383, at Docket Entry No. 385.) This Chapter 11 case was originally filed on October 4, 1982, as a Chapter 7 case and was converted to a Chapter 11 case by order of the Bankruptcy Court December 10, 1982. (See Bankruptcy Docket Entry numbers 1 and 23; Appendix Document No. 34) It is admitted that the Debtor's operations were completely shut down shortly after the conversion of the case to Chapter 11, and said glass business has not operated since. All of the Debtor's land, building, machinery, equipment, and all other assets that would be required to operate its former glass manufacturing business were sold in September of 1983. As of October 31, 1986, all of the Debtor's assets were converted to cash with the exception of a cause of action which the Trustee has filed against Security Pacific Business Credit, Inc., et al., in the United States District Court, Civil Action No. 83–2383, (the above-captioned case) alleging a "fraudulent conveyance". Since October 31, 1986, the only activity in this bankruptcy case has been the pursuit of that "fraudulent conveyance" cause of action. Since October 31, 1986, the Debtor has had no place of business, employees, payroll, telephone, work orders, future business, economic inventory, parts inventory, machinery or equipment, or any other tangible assets of any kind except cash. In order for the Debtor to get back into operations it would have to start from scratch in acquiring the necessary business facilities with which to operate a glass manufacturing business.

Title 11 U.S.C. Section 1112(b) of the Bankruptcy Code addresses this "Conversion Issue", now before this District Court. 11 U.S.C. § 1112(b) of the United States Bankruptcy Code outlines what elements a party in interest must establish in order to convert a Chapter 11 Reorganization into a Chapter 7 Liquidation. The portions of this Section relevant to Jeannette's bankruptcy reads as follows:

"(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States Trustee, and after notice and hearing, the Court may convert a case under this Chapter to a case under Chapter 7 of this Title or may dismiss a case under this Chapter, whichever is in the best interest of the creditors and of the estate, for cause, including—

(1) Continuing loss to or diminution of the estate *and* absence of a reasonable likelihood of rehabilitation;

(2) Inability to effectuate a plan;

(3) Unreasonable delay by the debtor that is prejudicial to the creditors;

[ (4) Additionally, the courts in their sound discretion have permitted a conversion from Chapter 11 to Chapter 7, for any "just cause". (See cases cited infra) ]".

### I.

*Because the undisputed Facts Demonstrate that there has been a Continuing and Severe Loss and Diminution of the Debtor's Jeannette Assets since its Bankruptcy Proceeding was Converted to Chapter 11 from Chapter 7 on December 10, 1982; and since it is Undisputed and in Fact Admitted by all Parties to this Proceeding that there is absolutely no Likelihood at all that said Debtor, Jeannette will be rehabilitated into a "Going Concern", the within Bankruptcy Proceeding must be*

*Converted from Chapter 11 to Chapter 7 of the Bankruptcy Code, as Amended.*

■ The first grounds for conversion to be examined, considering the economic and physical condition of the Debtor, is § 1112(b)(1) of the Bankruptcy Code which requires a showing of "continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation." This section requires a showing that two separate and distinct factors exist in regard to the Chapter 11 Bankruptcy proceeding in question, before the court will convert it to Chapter 7 or dismiss it.

The first prong of § 1112(b)(1), requires a showing of a continuing loss to the estate or a diminution of the estate. A showing of either will satisfy the first requirement of this section.

■ A moving party can establish a diminution of an estate if a substantial loss of assets can be shown from the bankruptcy filing date until the hearing on the Motion to Convert. *In re: D & F Meat Corporation*, 68 B.R. 39 (Bkrtcy.S.D.N.Y.1986)

A comparison of Jeannette's economic assets from the date of the bankruptcy filing until the hearing of January 29, 1988, on the Motion to Convert, displays a substantial diminution of the estate. When the petition was filed, Debtor possessed an entire glassmaking facility, including the equipment necessary for manufacturing. At that time, Debtor also had approximately 850 employees on its active payroll, plus various work orders and inventory on hand. Now, as previously stated, Debtor has none of these hard assets. These facts reveal a substantial diminution of the Debtor's estate.

The bankruptcy schedules filed by Jeannette Corporation at the beginning of the bankruptcy reflected that the total market value of Jeannette's assets as of the commencement of its bankruptcy case on October 4, 1982, was $8,132,518.00. (See Trustee's Disclosure Statement, Appendix Document No. 6, at page 9)

Between June 28, 1983, to October 31, 1986, all of the Debtor's assets were reduced to cash in the amount of $3,642,-664.55, and in the same period there were administrative and litigation expenditures of $1,449,972.65, and other unlisted and listed expenditures for a cash balance ending October 31, 1986, of $2,192,691.90.

Except for interest on the Debtor estate's cash deposits, no business profits or business income of any kind have been generated by this bankrupt since June 28, 1983, to the present date and for a period of over four years. (See Appendix Document No. 9, Bankruptcy Docket Entry No. 446)

By April 8, 1987, the Debtor's assets had diminished by almost six million dollars. (See Bankruptcy Court Depository Order and Appendix Document No. 18)

Additionally, the Trustee estimates that there will be an additional allowable administrative expenses in the amount of $760,-769.92. (See paragraph 18 of Appendix Document No. 23, United States District Court Case No. 83–2383, Docket Entry No. 399)

On page 19 of the Trustee's Disclosure Statement, (Appendix Document No. 6) under the heading, "5. Summary of the 'Plan of Reorganization'", we see the following:

"5. *Summary of the Plan of Reorganization*

The Plan of Reorganization proposes that the Court retain its jurisdiction over this estate and that the Trustee remain in control of the affairs of Jeannette Corporation, that he distribute the cash on hand as soon as practicable, and that he should seek to reduce any other remaining valuable property of the company, including its litigation, to money. He is to then make a final distribution, seek a final decree and close the bankruptcy estate as expeditiously as is compatable with the best interests of the holders of claims against the estate."

(See Trustee's Disclosure Statement, Appendix Document No. 6, at Page 19)

Likewise the Debtor's Plan for Reorganization is without doubt and admittedly a plan for liquidation of the assets of the

Debtor and is not a plan for rehabilitation of the debtor.

On page 26, of the Debtor's Disclosure Statement, we find the following statement:

"Because the Plan essentially provides for the liquidation of all the Debtor's assets and the distribution of the proceeds, it is quite similar to what would happen in a Chapter 7 liquidation."

(See Debtor's Disclosure Statement, Appendix Document No. 11, at page 26)

There is absolutely no chance at all for the Debtor to become rehabilitated into a "going concern" which fact is admitted by all interested parties.

A debtor must have a viable business in place in order to have any potential of rehabilitation, and where as in this case at bar, an ongoing lawsuit for an alleged fraudulent conveyance is the only corporate activity of any kind, there is clearly no chance for corporate rehabilitation. In re: *Golden Ocala Partnership*, 50 B.R. 552 (Bankruptcy M.D.Fla.1985) Elaborating on this point, the *Golden* Court stated:

"As noted, Golden conducted no business of any sort. It has no employees, it does not sell or buy anything or render any service to anyone. It has no assets of any kind except its claim, the validity of which is questionable, of a fraudulent transfer of the land once owned by Golden and now owned by the Reagin Group. The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state. See, in re: *Dolton Lodge Trust No. 35188*, 22 B.R. 918 (Bkrtcy.N.D.Ill.1982) "If there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its raison d'entre ..." In Re, *Ironsides, Inc.* [34] B.R. 337 (Bkrtcy.W.D.Ky.1983)".

In Re: *Golden* at 552.

Debtors who argue that an "ongoing business" is not required under Chapter 11 meet with little success. *In the matter of*

*Winshall Settlor's Trust*, 758 F.2d 1136 (6th Cir.1985) the Court in *Winshall* stated:

"Although appellant contends that there is no explicit "ongoing business" requirement to Chapter 11 reorganization, such a requirement is inherent in the statute and clearly implied in 11 U.S.C. 1112(b)." *Id.* at 1137.

As above stated, Jeannette is not operating an ongoing business nor does it possess any assets to use in business or serve as collateral for refinancing. The complete absence of economic activity is evidence that no reasonable likelihood of rehabilitation exists. Since Jeannette has no viable business, or potential viable business to protect or rehabilitate, their reason for remaining in Chapter 11 has evaporated.

In interpreting this section, courts have stressed that rehabilitation does not equal reorganization. In re: *The Ledges Apartments*, 58 B.R. 84 (Bkrtcy.D.Vt.1986) the *Ledges* Court stated:

To satisfy 11 U.S.C. § 1112(b)(1), requires additional finding that there is no reasonable likelihood of rehabilitation. Rehabilitation does not equal reorganization. Reorganization encompasses rehabilitation and may contemplate liquidation. Rehabilitation, on the other hand, may not include liquidation. As the term is used in § 1112(b)(1), it means "to put back in good condition: re-establish on a firm, sound basis".

*Id.* at 87.

Rehabilitation, under this section, has thus been defined to mean more than mere liquidation under a Chapter 11 proceeding, even though liquidation may constitute a permissible Plan of Reorganization under 11 U.S.C. § 1123(b)(4). *In the matter of E. Paul Kovacs and Company, Inc.*, 16 B.R. 203 (Bkrtcy.D.Ct.1981). In re: *Tolco Properties, Inc.*, 6 B.R. 482 (Bkrtcy.E.D.Va. 1980).

It is impossible to rationally comprehend Jeannette being rehabilitated and put back in a good sound operable position and reestablished on a firm basis. It definitely would be more efficient to build an entirely new glassmaking facility with brand new capital than to try and rebuild one with

what remains of this debtor. Jeannette has no reasonable likelihood of rehabilitation (as defined by case law interpreting this section) and thus does not qualify to remain in Chapter 11.

■ Jeannette's Trustee may claim that although they do not own a viable ongoing business, they do possess a fraudulent conveyance action which, in their opinion, may provide at some point in the future significant assets to the estate which can then be distributed to the creditors under 11 U.S.C. Section 1101. This scenario (no asset debtor excepting for a questionable cause of action) is not uncommon to the bankruptcy courts. As just noted in the *Golden* case, the debtor had no assets of any kind excepting a cause of action regarding a land transfer. The Court held that this Debtor had no reason being in Chapter 11 regardless of the potential cause of action, for there was no viable business worthy of protection and rehabilitation. *Golden,* supra, at 557.

In general, courts look to what capital and other actual assets a debtor possess which can be used in his Plan of Reorganization, however, potential recovery from a law suit is insufficient to create a reasonable likelihood of rehabilitation. *In the matter of Imperial Heights Apts., Ltd.* 18 B.R. 858 (Bkrtcy.S.D.Ohio, 1982). Since there is no way to establish the feasibility of a plan which is to be funded solely from the possibility of a law suit, bankruptcy courts will convert or dismiss such Chapter 11 bankruptcy cases. *In the matter of Winshall Settlor's Trust,* 758 F.2d 1136 (6th Cir.1985). Some Courts have stated that a mere potential law suit is insufficient to even invoke Chapter 11 jurisdiction if the debtor has no "business" to reorganize. *In re: 312 West 91st Street Company,* 35 B.R. 346 (Bkrtcy.S.D.N.Y.1983). The *312 West Court* held:

> ... the debtor has no income, no premises, and never opened its doors to the public. The debtor's only "business" consists of abusing the bankruptcy process by attempting to use this court as a forum for pursuing its tenuous state law claim for wrongful eviction.

*Id.* at 348.

Jeannette is similar to the above cases in that it has no ongoing business, tangible assets, or potential for rehabilitation. As noted, Chapter 11 Plans cannot be funded on potential recovery from future law suits. This is particularly so in this case where some of the former principals of the debtor are defendants in the fraudulent conveyance action brought by the Trustee. It is ridiculous to contemplate that after the litigation is completed by judgment or settlement that the principals will then organize the Debtor into an operating entity. The conclusion of this Chapter 11 case will be a liquidation. There is just no other possibility and bankruptcy courts have consistently held that this type of Debtor should not be in a Chapter 11 Bankruptcy.

Inasmuch as both prongs of 11 U.S.C. § 1112(b)(1), have been met, it is clear that this Debtor's estate may properly be converted from Chapter 11 to Chapter 7.

## II.

*Because the undisputed facts show beyond any doubt that the Reorganization Plan formulated by the Trustee and approved by the Bankruptcy Judge is unfeasible and can never be effectuated under any foreseeable circumstances because of the present inability of the Trustee to identify the Unsecured Creditors who are eligible to vote on the "Plan" and because of the present inability of the Trustee to assign a dollar value to the great majority of the claims in order to properly "weigh and/or apportion" the dollar value of each claimant, the within Bankruptcy proceeding must be converted from Chapter 11 to Chapter 7 of the Bankruptcy Code, as amended.*

■ Although the Debtor qualifies for conversion to Chapter 7 under 11 U.S.C. § 1112(b)(1), a second ground for conversion will be explored under § 1112(b)(2), which requires a showing that the Debtor lacks the ability to formulate or carry out a plan. Case law reveals that the inability to effectuate a plan and the absence of a

reasonable likelihood of rehabilitation [the second requirement of § 1112(b)(1) are closely related.

Bankruptcy Courts will use this section to convert or dismiss a Chapter 11 Debtor where it is shown that the Debtor is little more than a corporate shell lacking a place of business, employees, payroll, or discernible economic activity. *In re Larmar Estates, Inc.,* 6 B.R. 933 (Bkrtcy.E.D.N.Y. 1980); *In re Economy Cab and Tool Company, Inc.,* 44 B.R. 721 (Bkrtcy.D.Minn. 1984).

Courts are not required to give a detailed analysis of why they may consider a Plan to be unfeasible. *Fossum v. Federal Land Bank,* 764 F.2d 520, (8th Cir.1985). In *Fossum,* the Debtors filed a Plan of Reorganization and their creditor subsequently objected to the Plan on the basis that it was unfeasible. These creditors also sought a dismissal of the case under § 1112(b)(2). The Bankruptcy Court denied the confirmation of the Plan, finding it was unfeasible and also dismissed the case stating that, "there was a point at which the Debtor must realize that reorganization is simply not possible and that liquidation is the only feasible alternative." *Fossum, Id.* at 520. The debtors appealed this decision on the grounds that the Bankruptcy Court failed to make adequate findings of fact. This appeal was to no avail.

Perhaps the most detailed analysis of this section is found in *Clarkson v. Cooke Sales and Service Company,* 767 F.2d 417 (8th Cir.1985). This Court reasoned that if the Debtor could not submit a feasible Plan then they did not have the ability to effectuate a Plan. The *Clarkson Court* held:

"Although we sympathize with the Clarksons, we find that the feasibility test is firmly rooted and predictions based on objective fact. The Second Circuit has declared that the feasibility test contemplates "the probability of actual performance of the provisions of the plan. Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." (*In re Bergman,* 585 F.2d 1171 (2d Cir.1978). Pertinent factors to be considered include the businesses earning power, the sufficiency of the capitol structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company".

*Clarkson* at 420.

It is difficult to imagine how Jeannette is going to submit or effectuate a viable Plan of Reorganization. The Debtor has no "business" to reorganize and is nothing more than a mere "corporate shell". Courts consistently hold that such facts constitute an inability to effectuate a plan. Conversion or dismissal is proper under this section.

It is further the opinion of this Court that the Debtor's attitude in asserting the "bar date" as against the claims of the Active Employees and the Retirees will make it impossible as a practical matter for any Plan of Reorganization to be confirmed. Under Bankruptcy Code § 1111(a), all scheduled claims are deemed filed and are "therefore allowed under Bankruptcy Code § 502". All allowed unsecured claims have the right to vote on a Plan of Reorganization pursuant to Bankruptcy Code § 1126(a). Also under Bankruptcy Code § 1126(c) in order for a Plan of Reorganization to be accepted by a class of creditors at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class must vote to accept the Plan.

There are approximately 2027 unsecured non-priority claims in this case consisting of 882 trade creditors and 903 Active and 242 Retired Employees. In order for the Debtor to obtain confirmation of any plan, more than fifty (50%) percent in number of claimants and more than two-thirds in dollar amount must vote in favor of the Plan.

Of this 2027 Unsecured Creditors, all 1145 of the active and inactive employees have failed to file their complete claims prior to the "Claims bar date", October 31, 1983. The Debtor did schedule 732 active employee claims for vacation pay only.

However, the claims of 151 active employees, 242 retired employees and 95 unsecured trade creditors were not scheduled or filed prior to October 31, 1983, the "claims bar date". It is noted that all of the employees (active and retirees) have not as yet established the exact amount of their claim. Further, it is an open question as to the legal effect of the "claims bar date" as to the 1145 employee claims.

Additionally, litigation as to whether and/or when the Collective Bargaining Contract was rejected by the Trustee will have to be concluded in order to assess the dollar amount of the employee's vote.

Moreover, contrary to the Trustee's assertions, equity does not compel the blanket extension of the "claims bar date" for all late claims in this case under Rule 3003(c)(3).[1]

Although it is well established that a violation of a creditor's due process rights may be "cause" for extension of the bar date under Rule 3003(c)(3), courts have held that the amount of notice which is necessary [to comport with due process] is dependent upon the facts and circumstances of each particular case. *Sheftelman v. Standard Metals Corporation*, 839 F.2d 1383 (10th Cir.1987) (per curiam) [citing *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) ]. Here, the late claimants fall into at least three different categories.

1. Many of the late claimants, notably the active Union employees, *received written notice* of the "bar date". It is clear that no cause exists for extension as to their claims under Rule 3003(c)(3). *In re Siouxland Beef Processing Company*, 55 B.R. 95, 100 (Bankry.N.D.Iowa 1985) ["Rule 3003(c) ... mandates that any creditor whose claim is unscheduled shall file a proof of claim within the time fixed by the court."]

2. Many other late claimants who did not receive written notice of the "bar date" plainly had actual notice of Jeannette's bankruptcy from the widespread publicity it received. This notice may be evidenced, in part, by their attendance at hearings and their active involvement in these proceedings. A determination as to whether sufficient "cause" exists for extension of the "bar date" under Rule 3003(c)(3) as to a particular claimant in this category may depend on (i) whether the Debtor knowingly failed to list the claimant (See *In re Siouxland Beef, Id.*), or (ii) whether the claimant waited too long after learning of the Debtor's bankruptcy before asserting his claim against the estate (see *In re: Cmehil*, 43 B.R. 404 (Bankry.N.D.Ohio 1984)

3. Finally, there are undoubtedly other late claimants as to whom, for a variety of reasons, equity may require or may not require the extension of the "bar date". This category would include, for example, people who received no notice—written or actual—of the existence of the bankruptcy proceeding and people who were incapacitated and thus unable to file a claim on time.

Before it is known who has the right to vote on either of the Trustee and/or Debtor Plan's of Reorganization and the dollar amount of each claim, there will have to be at least over 1200 separate "estimation hearings" on the issue of late employee claims which will take years to litigate.

Additionally, the Debtor's Disclosure Statement indicates that the Debtor will seek the complete disallowance of the Pension Benefit Guaranty Corporation Claim. (See page 105 of hearing transcript, Docket Entry No. 387, United States District

---

1. The fact that many of the late claims arise from the Debtor's rejection of executory contracts does not alter this result. Despite the Trustee's assertions to the contrary, Rule 3002(c)(4) does not apply to Chapter 11 proceedings. *Liakas v. Creditors' Committee, of Deja Vu, Inc.*, 780 F.2d 176, 179 (1st Cir.1986). Moreover, even assuming *arguendo*, that it did apply, the language of Rule 3002(c)(4) is permissive, not mandatory. *Id.* Further, see page 19 of Slip Opinion, *Remington Rand Corp. etc. v. The Kilbarr Corp. etc.*, 836 F.2d 825 (3rd Cir.1988). Evidentiary facts necessary to support the filing of a late claim in a bankruptcy matter must be developed on a case by case basis to determine the legal justification for filing a late claim. To be reported at 836 F.2d 825 (3rd Cir.1988.)

Court, Civil Action No. 83–2383). The Trustee's Disclosure Statement, (Appendix Document No. 6, page 22) as to the Pension Benefit Guaranty Corporation (PBGC) speaks of a tentative agreement with counsel for the "PBGC", wherein PBGC would release its priority status and would settle with the Debtor's estate for an estimated $1,387.528.00 (See also paragraphs 11, 12 and 13, Docket Entry No. 399, Appendix Document No. 23) In the usual case an "estimation hearing" would be necessary to determine the "weight" of PBGC's vote on a Plan of Reorganization which has the potential of being in the amount of $7,658,-780.00. In this PBGC claim situation it is impossible for a Court to estimate the value of such a claim for voting purposes on a Plan of Reorganization because the allowable amount of the largest PBGC claim No. 429 is dependent upon a judicial determination of the merits and value of the District Court "fraudulent conveyance" litigation since by a Federal Statute (ERISA) the claim is limited to an amount not to exceed thirty (30%) percent of the Debtor's "net worth" as of March of 1983, when Debtor's pension plan was terminated. (There also is a contention as to the exact time of termination of the pension plan) ERISA provides that the Debtor's "net worth" is to be increased by the value of the District Court "fraudulent conveyance" litigation. This District Judge believes that it is presently impossible for a Judge to fairly estimate the value of said litigation. PBGC is presenting the No. 429 claim as being one entitled to priority for $6,800,000.00.

Contrary to the Trustee's Plan of Reorganization and Disclosure Statement, (Appendix Document No. 6, page 22) it is apparent that the PBGC claim cannot be compromised, and consequently, the Trustee moved to withdraw the reference of this matter from the Bankruptcy Court to the United States District Court. (See the above-captioned Civil Action No. 87–2384, which is related to the "fraudulent conveyance" litigation, Civil Action No. 83–2383)

Further, if it is held that the PBGC is entitled to priority, it would be scheduled in a "separate class" and as a result the entire Plan of Reorganization would be "held hostage" to the PBGC vote, which as we have already noted said vote is impossible to ascertain within the foreseeable future. In any event, no vote on a Reorganization Plan can be cast by PBGC until the "dollar weight" of PBGC's vote as to the Reorganization Plan can be determined, which vote is completely impossible within a reasonable time.

In addition to the many contested claims and the contested PBGC claims, we have a multitude of other outstanding disputed claims that need an "estimation" resolution. See Exhibits "A" through "F" of Appendix Document No. 23 Civil Action No. 83–2383, Docket Entry No. 399.

Another vexing legal problem as to the estimated value that can be given to an outstanding contested claim arises by virtue of a claim for indemnification that the Defendant, Security Pacific has with respect to any loss that it might suffer in the above-captioned "fraudulent conveyance" litigation and just as in the PBGC claim, Security Pacific wouldn't know what its claims in fact were until the "fraudulent conveyance" litigation is ended. Again, an "estimation hearing" would be necessary to ascertain the voting weight of said claim, if any. A fair "estimate" is impossible.

Other outstanding contested claims that will warrant much court attention in order to estimate the weight of the claimant's voting rights are the "insider claims" of Mr. Brogan, Mr. Janowiak and others. (See page 111 of hearing transcript, Docket Entry No. 387, Civil Action No. 83–2383.)

Also, there are a group of commission salesmen who have outstanding contested claims that need estimating; (See page 118 of hearing transcript, Docket Entry No. 387, Civil Action No. 83–2383); Profit Sharing Claims to be estimated; (See page 119 of hearing tanscript, Docket Entry No. 387, Civil Action No. 83–2383); Royalty Technology Claims to be estimated; (See page 121 of hearing transcript, Docket Entry No. 387, Civil Action No. 83–2383); McCracken General Employee Claim for $29,470,-463.00, has to have a value estimation hear-

ing. (See pages 121 to 134, inclusive of the hearing transcript, Docket Entry No. 387, Civil Action No. 83–2383)

Also there are 95 outstanding contested claims of unsecured trade creditors who filed after the "claims bar date" whose claims must receive a "value estimation hearing".

As has been mentioned even if both the Trustee and the Debtor would receive permission of this Court to file a Plan of Reorganization with over two thousand of the eligible unsecured claimants and/or creditors of the Debtor's estate, the identity and dollar amount claimed by each claimant must be first estimated before a vote may be had on the proposed Reorganization Plan.

There are over 1400 contested claims raising issues as to the identity of the claimant, (late filing claimants) the amount of the claim and/or both that require "claim estimation" hearing. Section 502(c) of the Bankruptcy Code provides:

"There shall be estimated for purposes of allowance under this section—(1) any contingent or unliquidated claim, fixing of liquidation of which, as the case may be, would unduly delay the closing of the case....".

The United States Court of Appeals for the Third Circuit in the case of *Bittner v. Borne Chemical Co., Inc.*, (691 F.2d 134, 135 (1982)) set forth the procedure for estimating contested claims as follows:

"The Code, The Rules of Bankruptcy Procedure, 11 U.S.C.App. (1977) and the Suggested Interim Bankruptcy Rules 11 U.S.C.A. (1982) are silent as to the manner in which contingent or unliquidated claims are to be estimated. Despite the lack of express direction on the matter, we are persuaded that Congress intended the procedure to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the particular contingencies at issue. The principal consideration must be an accommodation to the underlying purposes of the Code. It is conceivable that in rare and unusual cases arbitration or even a jury trial on all or some of the issues may be necessary to obtain reasonably accurate evaluation of the claims. (See 3 *Collier on Bankruptcy* ¶ 502.03 (15th ed. 1981) Such methods, however, usually will run counter to the efficient administration of the bankrupt's estate and where there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value. In doing so, the court is bound by the legal rules which may govern the ultimate value of the claim. For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law. See, e.g., 3 *Collier on Bankruptcy* ¶ 57.15[3.2] (14th ed. 1977) However, there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code."

Assuming a six hour court day and conservatively four hours to each of over 1400 claim estimation hearings. (Taking evidence, hearing the opposing arguments, and making a decision will take in fact, twice four hours or eight hours) It will take one Bankruptcy Judge over 3½ years to complete all of the estimation hearings alone and render a decision as to who is entitled to vote and the "dollar weight" that will be given to each claimant's vote.

Contrary to the specious arguments of the plaintiff's counsel in the "fraudulent conveyance" litigation it is clear that all of the interested parties in this case have been placed in a procedural box, for once an offer of settlement of the "fraudulent conveyance" litigation was made and referred to in both the Trustee's and Debtor's proposed Plans of Reorganization, the qualified voters (the "unsecured creditors" of the various "impaired classes") are entitled prior to any trial on the merits to vote on whether they will reject or accept the plan and/or plans which are submitted to them for their approval or rejection, but the procedural catch is that no one knows the identity of the voters and the "dollar weight" of their vote.

The Trustee Moody, presumably with the advice of their attorneys Campbell and Cindrich unlawfully have taken upon themselves the unilateral power to reject the offer of settlement in the "fraudulent conveyance" litigation in the amount of one and one quarter million dollars without the consent of the Unsecured Creditors, and where said attorneys admittedly have a vested financial interest in the litigation. The trustee must give the real parties in interest and/or Unsecured Creditors (whose identify and/or dollar amount in over 1400 cases is now unknown), the opportunity to vote as to whether they will accept the offer of settlement. The offer of settlement [1] was an ongoing binding offer that should have been submitted to the Unsecured Creditors for their consideration and it was clearly erroneous for the Bankruptcy Judge to have approved the submission of the Trustee's Plan of Reorganization and Disclosure Statement to the Unsecured Creditors for approval, without giving the unsecured creditors an opportunity to accept the offer of settlement. *See* Disciplinary Rule of the Pennsylvania Code of Professional Responsibility which currently has been adopted by the United States District Court as follows:

A. DR 5–106. Settling Similar Claims of Clients

(A) *A lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against his clients, unless each client has consented to the settlement after being advised of the existence and nature of all the claims involved in the proposed settlement, of the total amount of the settlement, and of the participation of each person in settlement.*

(See Page 129 of Appendix Document No. 33)

B. EC 7–7 Duty of a Lawyer to a Client

In certain areas of legal representation not affecting the merits of the cause or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions on his own. But otherwise the authority to make decisions is exclusively that of the client and, if made within the framework of the law, such decisions are binding on his lawyer. As typical examples in civil cases, it is for the client to decide whether he will accept a settlement offer.

(See Pages 130 and 131 of Appendix Document No. 33)

(See Trustee's proposed plan and amendment thereto.) (See Appendix Documents Nos. 5, 6 at Page 18 and 7) (See Debtor's proposed Plan and Disclosure Statement Appendix Document Nos. 10 and 11)

The "fraudulent conveyance" case under the circumstances, cannot be tried under any circumstances unless and until the real parties in interest, i.e., the duly qualified unsecured creditor voters are fully informed as to the risks of success or failure involved in prosecuting the litigation and are given a chance to either approve or disapprove of a proposed settlement as the same are suggested and explained in the proposed and/or amended rival "Plans of Reorganization" of the Debtor. But as before noted, there can be no voting on the "plans" because the names of the "voters" and the "dollar weight" of their votes cannot be properly identified at this time. The three or four years of delay which would be necessitated by the need of the Bankruptcy Court to estimate the true identity of the 1400 claimants and/or the value of over 1400 claims on a case by case basis clearly reveals that as a practical matter the Trustee and/or the Debtor lack the present ability to effectuate a Plan of Reorganization (liquidation in fact) within a reasonable time, so clearly for this reason this bankruptcy case should be converted from Chapter 11 to Chapter 7 for ultimate liquidation.

III.

*Because the undisputed facts indicate beyond any doubt that the final completion of this "fraudulent convey-*

1. (See Appendix Document No. 17)

*ance" litigation will be delayed for years since there can be no vote on a Plan of Reorganization addressing the issue of accepting or rejecting the offer to settle said litigation until the Trustee is able to identify the Creditors who are eligible to vote on the Plan and until the Trustee is able to assign a dollar value to said creditor's claims, and hence there will be an inordinate delay in bringing this bankruptcy proceeding under Chapter 11 to an end; and further, since it it admitted by all parties that this Debtor's assets must be liquidated in any event, it is clear that this Bankruptcy Proceeding must be converted from Chapter 11 to Chapter 7 of the Bankruptcy Code as amended and to permit this case to be processed as a class action in order to ultimately bring this matter to an end within a reasonable time.*

█ The final of the enumerated causes to be examined that is applicable to Jeannette's situation is § 1112(b)(3) which states that a case may be converted or dismissed if the moving party shows an unreasonable delay by the Debtor that is prejudicial to creditors. The requirements of this "cause" are often interrelated with the requirements of § 1112(b)(1) and (2) and courts often use all three of these sections, in converting or dismissing a Chapter 11 case. [NOTE: Because all four of these reasons for converting this Bankruptcy case to Chapter 7 are related and are based on the same factual history there is much repetition in this opinion.]

Courts will often combine § 1112(b)(2) and (3) and hold that the Debtor made an unreasonable delay that is prejudicial to the creditors because the Debtor did not or cannot effectuate a plan within a certain time period. *In re Koerner v. Colonial Bank,* 800 F.2d 1358, (5th Cir.1986). *In re Galvin,* 49 B.R. 665 (Bkrtcy.D.N.D.1985). In *Galvin,* the Debtor filed for relief under Chapter 11 on August 31, 1983, and filed a Plan on October 10, 1984. This Plan was not confirmed due to valid objections by certain creditors and the court advised Debtor's counsel to continue their efforts towards achieving a confirmable Plan. The

hearing was continued until January 16, 1985. The Plan, with no modifications or changes, again came on for consideration and confirmation was thus again rescheduled. After adequate protection payments were not made, creditors filed a motion to convert or dismiss. The *Galvin* Court held:

"Despite the passage of one year under the protective umbrella of Chapter 11, the debtors had been unable to operate on even a marginally profitable basis as demonstrated by the financial reports.... It is not the purpose of Chapter 11 to allow a debtor a permanent cloak of protection while the estate assets continue to diminish and the operational coherency unravels. The function of Chapter 11 is rehabilitation—not disintigration.... The case has been unreasonably delayed without any prospect of rehabilitation in the offering."

*Galvin* at 669.

After examining the totality of the circumstances, the *Galvin* Court held that the inability of the Debtor to effectuate a confirmable Plan constitutes a unreasonable delay by the Debtor and thus ordered the case dismissed.

In *Koerner,* supra the court converted a reorganization proceeding to a straight bankruptcy because of the Debtor's inability to effectuate a Plan and the Debtor's unreasonable delay which was prejudicial to its creditors. The court specifically noted that it had given the Debtor every opportunity to submit a feasible Plan over a 16 month period. Instead, Koerner submitted what the bankruptcy Judge described as a nebulous Plan based on projected legal fees that was neither adequate, feasible nor practicable and would not result in a reorganization. *Koerner,* supra, at 1368

The purpose of section 1112(b), is outlined in *Hansen v. Tiana Queen Motel, Inc.,* 749 F.2d 146 (2d Cir.1984). This Court held that "the purpose of § 1112(b) is not to test the Debtor's good faith; it is to provide relief where the Debtor's efforts, however heroic, have proven inade-

quate to the task of reorganizing his affairs effectively within a reasonable amount of time." *Hansen, Id.* at 152. Here the court specifically refrained from fixing a certain amount of time to be allowed a Debtor in order to effect a Plan of Reorganization. However, they felt that in this particular matter, where 15 months have elapsed from the filing of the Chapter 11 petitions, too much time had elapsed and it was within their discretion to convert the case to Chapter Seven.

In the case at hand, on October 4, 1982, an involuntary petition under Chapter 7 was filed by certain creditors of Jeannette. On its own motion, Jeannette converted the case to a Chapter 11 on December 23, 1982. Since this time, (almost five years) six Plans of Reorganization have been submitted and no confirmable Plan of Reorganization has been submitted to the Bankruptcy Court. It is clear that no possibility of rehabilitation or reorganization exists for Jeannette. A delay of approximately five years from Chapter 11 filing with no potential affirmable Plan in sight constitutes an unreasonable delay by Jeannette and/or the Trustee which is prejudicial to the creditors.

Because of the need to utilize formal bankruptcy court proceedings on a case by case basis to establish the identity and estimate the value of over 1400 Unsecured Creditor claims in order for there to be a vote on whether the Reorganization Plan and/or Plans will be approved or disapproved, [(which will take three or four years to accomplish even before the "fraudulent conveyance" law suit can be brought to trial, since the Unsecured Creditors (whose identity and dollar weight of their vote is unknown) must be given the opportunity to accept or reject the offer of settlement before the "fraudulent conveyance" case can be tried,)] it is undoubted that the Unsecured Creditors certainly will be unjustifiably delayed and prejudiced unlawfully to their economic detriment if the case is not converted immediately to Chapter 7 of the Bankruptcy Code.

## IV.

*Because the undisputed facts demonstrate that the Trustee and the attorneys for the Trustee have maintained this Chapter 11 proceeding for personal financial gain contrary to the Pennsylvania Code of Professional Responsibility, and because said Trustee attorneys are now pressing this District Court to extend the "claims bar date" in lieu of conversion to Chapter 7 of the Bankruptcy Code in order to protect their admitted vested financial interest in the "fraudulent conveyance" litigation, (which attorneys' vested interest is in a direct and obvious conflict with the financial interests of their original clients, the 882 Unsecured Trade Creditors,) and because there is admittedly no present intention of any kind by anybody to reorganize this debtor, it is the firm conclusion of this District Court that this Chapter 11 proceeding is being maintained for bad faith unethical reasons and the said bankruptcy proceeding must be converted to Chapter 7 of the Bankruptcy Code as amended for just cause.*

It is important to note that Bankruptcy Courts and/or District Courts are not confined to pigeon holing their particular set of circumstances into one of the defined "causes" listed in subsection (b) of § 1112 whenever they desire to convert or dismiss a case filed under Chapter 11. A careful reading of the final phrase of subsection (b) reveals that "cause" includes, but is not necessarily limited to, the thereafter enumerated circumstances. Congress has made it clear that the list of what constitutes cause under § 1112(b) is not exclusive. The House of Representatives discussion of this section states:

"Subsection (b) gives wide discretion to the court to make an appropriate disposition of the case when a party in interest requests. The court is permitted to convert a reorganization case to a liquidation case or to dismiss the case, whichever is in the best interest of the creditors and the estate, only for cause ... The list of [nine conditions] is not ex-

haustive. The court will be able to consider other factors as they arise, and use its equitable powers to reach an appropriate result in individual cases. H.R.Rep. Cong. and Admin.News 1987, Page 5781, 6361, 6362."

Recent bankruptcy opinions have indicated a willingness on the part of the Courts to use their judicial discretion and equitable powers in expanding the definition of exactly what constitutes "cause" for which a Chapter 11 bankruptcy may be converted or dismissed. Lack of good faith to prosecute a case, and lack of intent to reorganize are additional causes for which a Chapter 11 bankruptcy may be converted or dismissed. These additional "causes" will be examined in the light of the facts of this Jeannette bankruptcy.

A general area of judge made law which may be used to convert or dismiss a Chapter 11 case is "lack of good faith" by the Debtor and/or Trustees in filing and maintaining a Chapter 11 bankruptcy. Although bad faith is not a specific ground for dismissal or conversion under § 1112(b), the legislative history of this section leaves no doubt that the Court may consider whatever factors it deems relevant in deciding the case. *In the Matter of Mogul*, 17 B.R. 680 (Bkrtcy.M.D.Fla.1982). Elaborating on this point, the *Mogul* Court held:

> "There is nothing in the legislative history which would indicate that Congress, by omitting the express requirement of "good faith" intended to do away with the safeguard against abuse and misuse of the process, a safeguard which has long been established and accepted as part of the bankruptcy philosophy for almost a century. Accordingly, good faith must be viewed as an implied prerequisite for the debtor's ability or obtaining relief under this Chapter [11]."

*Mogul* at 682.

Other courts have held that good faith requires an intent to reorganize accompanied by a reasonable possibility of success. *In the matter of W.J. Rewoldt Company*, 22 B.R. 459 (Bkrtcy.E.D.Mich.1982). The Court in Rewoldt stated that the special

remedy intended for reorganization in Chapter 11 is misused when a Debtor files such a reorganization seeking only an "overly luxurious administrative vehicle" to achieve a liquidation more expeditiously accomplished in Chapter 7. *In re Rewoldt* at 462. In *Jeannette*, the Debtor has no reasonable likelihood of reorganization and is actually and purposely in the process of liquidation. For both Trustee and the Debtor to insist upon remaining in Chapter 11 under the present circumstances represents a lack of good faith on the part of both the Trustee and Jeannette.

This entire bankruptcy case was started in bad faith. As noted earlier in the factual history of this case, the "Involuntary Petition in Bankruptcy" was filed by Attorney Campbell (who is still greatly involved in this case and admits to having a personal "vested monetary interest" in the "fraudulent conveyance" litigation,) with the support of only one unsecured creditor. This "Petition" was legally void on its face and should have been dismissed immediately as "out of hand". Instead, with the concurrence of Attorney Campbell, the Debtor's attorneys and the Bankruptcy Court a "Void Chapter Seven Proceeding" was amended after the fact and was converted into a so-called viable Chapter Eleven Reorganization.

Very soon after the conversion to Chapter Eleven on December 10, 1982, Attorney Campbell without officially abandoning his initial client in this case, the George Hill Company, he, Campbell, became attorney for a group of nine unsecured trade creditors.

Since the filing of Attorney Campbell's spurious Petition for Involuntary Bankruptcy in this case, all of the Debtor's estate has been reduced to cash, (except for the above-captioned on-going "fraudulent conveyance" law suit) in the total cash amount of $3,642,664.55. (See Appendix Document 9)

As noted in the factual history of the case, out of the over 3½ million in total cash taken in by the Debtor, over one million dollars has been paid out and/or claimed for attorney and accounting fees

and over ⅓ of one million dollars has been paid to and or claimed by Mr. Campbell's Firm, Campbell & Levine. In addition, as noted in the historical facts, Mr. Campbell claims a "vested interest" in the alleged one-third contingent fee arrangement concerning the above-captioned and on-going "fraudulent conveyance" litigation and which contingent fee could theoretically amount to approximately 12 million dollars.

At the time of the "Contingent Fee Order" by Judge Gibson, on July 28, 1983, there was a cash balance of $1,615,492.42, in the bankrupt debtor's account and by April 8, 1987, (See Bankruptcy Docket Entry No. 533) there was $2,210,000.00 in cash in the bank. The cash balance on the 31st of October, 1986, was $2,192,691.90. (See Bankruptcy Docket Entry No. 446). Clearly, there was no need for a contingent fee agreement in this case. (See Appendix Document Numbers 24, 25 and 36.)

The order of July 27, 1983, also appointed James Moody as Trustee for the Debtor and directed the said James Moody to join in the litigation now before this Court which was later filed on September 22, 1983. (See paragraph 12 of the Order, Bankruptcy Docket Entry No. 165)

Additionally, and above-noted, the Order of July 27, 1983, required the Debtor to withdraw all pending Plans of Reorganization. (See paragraph One of the Order of Bankruptcy Docket Entry No. 165)

(NOTE: There were three Bankruptcy Court Orders relating to initiating or beginning the "fraudulent conveyance" litigation now before this Court.

The First Order (Appendix Document No. 2) was dated July 27, 1983, withdrawing the pending Plan of Reorganization, (Third Amended Proposed Plan and Fourth Plan to be filed) approving the sale of certain assets, appointing James Moody, Trustee and granting the Trustee and Committee of Unsecured Creditors Standing to Sue and approving their application to engage Co-counsel to sue certain parties in the United States District Court for allegedly being involved in fraudulent conveyance of the Debtor's (Jeannette Corp.) property.

The Second Order (Appendix Document No. 3) was dated July 28, 1983, the next day after the First Order (See Appendix Document 2) was signed by the Bankruptcy Court, and permitted the Committee of Unsecured Creditors to engage the Law Firms of Campbell & Levine, and Mansmann, Cindrich and Huber, as its legal counsel to pursue the fraudulent conveyance litigation with a 33% contingent fee arrangement.

The Third Order (Appendix Document No. 4) also was dated on July 28, 1983, the next day after the First Order (See Appendix Document No. 2) was signed by the Bankruptcy Court and granting the Committee of Unsecured Creditors Standing to Sue on behalf of the Debtor, (Jeannette Corp) to recover damages arising out of alleged fraudulent conveyances of Debtor's property.

The Debtor's Counsel, Sanford M. Lampl, consented to the First Order of July 27, 1983, and Douglas Campbell, attorney for the Committee of Unsecured Creditors, also consented to the same, and according to the "First Order" (Appendix Document No. 2, there was a hearing prior to the entry of the First Order. However, as to both the "Second Order" (Appendix Document No. 3) and the "Third Order" (Appendix Document No. 4) there was no prior notice, no hearing, no consent signed by either Debtor's attorney, Trustee's attorney and/or the attorney for the Committee of Unsecured Creditors, and in fact, to this day, neither the "Second Order" (Bankruptcy Docket Entry No. 100, Appendix Document No. 3) or the "Third Order" have been time-stamped by the Clerk of the Bankruptcy Court; nor were these "Second" and "Third" Orders mailed to interested parties.)

Again, we have Attorney Campbell seeking and obtaining the signature of the Bankruptcy Judge on two spurious Court Orders in the Bankruptcy Court in this case.

As noted above, a Trustee, James Moody had been appointed and he was authorized to begin this "fraudulent conveyance" case (Appendix Document No. 2) as of July 27,

1983. The companion portion of the Order of July 27, 1983, (Appendix Document No. 2) and the two Orders of July 28, 1983, (Appendix Documents Nos. 3 and 4) purporting to grant the application of the Committee of Unsecured Creditors to engage Co-counsel on 33% contingency basis with Standing to Sue as a co-plaintiff in the "fraudulent conveyance" case were all void *ab initio* and all three of these Orders are and were of no legal force or effect, since the Trustee alone at that time was the only party with proper standing to bring suit to void the alleged "fraudulent conveyances".

The Bankruptcy Judge who signed these Orders of July 27, 1983, and July 28, 1983, knew full well that a Creditor's Committee is allowed to initiate legal proceedings *only* when the Trustee or Debtor in possession unjustifiably fails to bring a necessary law suit and/or has abused its discretion in not suing to avoid a preferential transfer. In fact, this very Bankruptcy Judge who signed these three Orders as above-noted, had so ruled in the case of *In re Monsour Medical Center*, 5 B.R. 715, 718 (Bankry. W.D.Pa.1980). In fact, the Monsour case was cited with approval on the same point of law, (*In re STN Enterprises* 779 F.2d 901, 904 (2nd Cir.1985) when the Court of Appeals held unequivocally that the creditor Committees are allowed to initiate legal proceedings *only* when the Trustee or Debtor in possession unjustifiably fails to bring suit or abused its discretion in not suing to avoid a preferential transfer. Sandford Lampl, who was at that time attorney for one of the parties in the Monsour case and was presumably knowledgable about the law, and who is the attorney for the Debtor in this Jeannette case, knew that the Creditors' Committee had no standing in this case now before this Court, either to sue and/or to engage co-counsel to sue on any basis much less a "contingent fee" basis, and to this very day the Debtor's attorney has not objected to the same.

■ In this case at bar, as above noted, the Trustee in fact entered suit to avoid the alleged "fraudulent conveyance" and there was absolutely no reason of any kind for the Unsecured Creditors' Committee to join this action as a co-plaintiff especially when Mr. Campbell was representing both the Trustee and the Committee of Unsecured Creditors in this above-captioned case.

Although it is clear that this Court not only has the power but will in fact exercise the power (See F.R.C.P. 21) sua sponte to dismiss the Unsecured Creditors' Committee as a party-plaintiff in this case which will moot many other serious ethical considerations involved in this case, this Court will nevertheless touch upon some of the many ethical problems that have arisen in this matter which will demonstrate that a Chapter 11 Reorganization of this Debtor (even in liquidation) is now being maintained for bad faith reasons. It will be noted as this Opinion unfolds, that it was from the very beginning of the "fraudulent conveyance" litigation, impossible in good faith and in keeping with the Pennsylvania Code of Professional Responsibility for plaintiffs' attorneys to litigate the "fraudulent conveyance" matter on a Bankruptcy Court Ordered "contingent fee basis" in the case at bar and to simultaneously and properly represent and advise the hundreds of multiple clients who have adverse and conflicting legal interests in the underlying bankruptcy matter and in this "fraudulent conveyance litigation" which are now before this Court.

Some of the ethical problems in this case that are addressed by the Pennsylvania Code of Professional Responsibility will now be addressed in this Opinion.

■ A lawyer should be very cautious and slow before obtaining a financial interest in his client's litigation, especially where as in this case, the client-debtor has sufficient funds on hand to afford an attorney on an hourly basis.

The usual and ordinary justification for entering into a contingent fee arrangement is to make certain that indigent and/or financially less affluent persons can obtain lawyers of their choice.

The Pennsylvania Code of Professional Responsibility (hereinafter referred to as "Ethics Code") provides in several relevant sections as follows:

## Canon 5

### A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client

### ETHICAL CONSIDERATIONS

EC 5–1. *The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.*

EC 5–2. *A lawyer should not accept proffered employment if his personal interests or desires will, or there is a reasonable probability that they will, affect adversely the advice to be given or services to be rendered the prospective client. After accepting employment, a lawyer carefully should refrain from acquiring a property right or assuming a position that would tend to make his judgment less protective of the interests of his client.*

EC 5–3. *The self-interest of a lawyer resulting from his ownership of property in which his client also has an interest or which may affect property of his client may interfere with the exercise of free judgment on behalf of his client.* If such interference would occur with respect to a prospective client, a lawyer should decline employment proffered by him. *After accepting employment, a lawyer should not acquire property rights that would adversely affect his professional judgment in the representation of his client. Even if the property interests of a lawyer do not presently interfere with the exercise of his independent judgment, but the likelihood of interference can reasonably be foreseen by him. a lawyer should explain the situation to his client and should decline employment or withdraw unless the client consents to the continuance of the relationship after full disclosure.* A lawyer should not seek to persuade his client to permit him to invest in an undertaking of his client, nor

make improper use of his professional relationship to influence his client …

EC 5–7. *The possibility of an adverse effect upon the exercise of free judgment by a lawyer on behalf of his client during litigation generally makes it undesirable for the lawyer to acquire a proprietary interest in the cause of his client or otherwise to become financially interested in the outcome of the litigation.* However it is not improper for a lawyer to protect his right to collect a fee for his services by the assertion of legally permissible liens, even though by doing so he may acquire an interest in the outcome of litigation. *Although a contingent fee arrangement gives a lawyer a financial interest in the outcome of litigation, a reasonable contingent fee is permissible in civil cases because it may be the only means by which a layman can obtain the services of a lawyer of his choice. But a lawyer, because he is in a better position to evaluate a cause of action, should enter into a contingent fee arrangement only in those instances where the arrangement will be beneficial to the client.*

The basic ethical problem in this case arose because the "contingent fee arrangement" in regard to the "fraudulent conveyance litigation" was not entered into between the plaintiff attorneys and the clients (the unsecured creditors.) In this case, the record of this case clearly shows that the "contingent fee arrangement" was created by the order of a Bankruptcy Judge in an ex parte unscheduled hearing without any recorded notice to any of the unsecured creditors and/or their attorneys, and without the knowledge, advice, vote and/or consent of said unsecured creditors who are the real parties in interest.

The "Ethics Code" provides in relevant part that the "consent" of the client is critical to the attorney-client relationship.

EC 7–8. *A lawyer should exert his best efforts to insure that decisions of his client are made only after the client has been informed of relevant considerations.* A lawyer ought to initiate this decision-making process if the client does

not do so. Advice of a lawyer to his client need not be confined to purely legal considerations. *A lawyer should advise his client of the possible effect of each legal alternative.* A lawyer should bring to bear upon this decision-making process the fullness of his experience as well as his objective viewpoint. In assisting his client to reach a proper decision, it is often desirable for a lawyer to point out those factors which may lead to a decision that is morally just as well as legally permissible. He may emphasize the possibility of harsh consequences that might result from assertion of legally permissible positions. *In the final analysis, however, the lawyer should always remember that the decision whether to forego legally available objectives or methods because of non-legal factors is ultimately for the client and not for himself.*

### DISCIPLINARY RULES

DR 5–101. Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.

(A) *Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.*

DR 5–103. Avoiding Acquisition of Interest in Litigation.

(A) *A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:*

(1) Acquire a lien granted by law to secure his fee or expenses.

(2) *Contract with a client for a reasonable contingent fee in a civil case.*

(There was no attorney-client contingent fee arrangement in this case)

█ It is true that in a proper case a lawyer may take a bankrupt debtor's case such as this "fraudulent conveyance litigation" on a contingent fee basis, but as will be discussed later in this Opinion, there first must be a hearing convened after proper notice to all interested parties and then a "cost-benefit" hearing must be held to determine the propriety of conducting litigation for the bankrupt debtor on any basis. There was no such "cost-benefit" hearing scheduled, noticed or held in this case at bar.

As more fully discussed elsewhere in this Opinion, plaintiffs attorney, Mr. Campbell, who has openly admitted to having a personal vested financial interest in this "fraudulent conveyance litigation",[1] also admittedly took it upon himself to reject an offer of settlement in the amount of $1,250,000.00, without notice, contact, with or advice to his clients,[2] the Unsecured Creditors. This action on the part of said plaintiff attorney is contrary to the following provisions of the "Ethics Code".

DR 5–106. Settling Similar Claims of Clients.

(A) *A lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against his clients, unless each client has consented to the settlement after being advised of the existence and nature of all of the claims involved in the proposed settlement, of the total amount of the settlement, and of the participation of each person in the settlement.*

EC 7–7. *In certain areas of legal representation not affecting the merits of the cause or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions on his own. But, otherwise the authority to make decisions is exclusively that of the client and, if made within the frame-*

---

**1.** *See* Pages 43, 44, 45 of Findings of Fact. *See* also Appendix Document No. 16, beginning at page 42, line 9, thru page 44. *See* letter continuing the offer of settlement indefinitely, Appendix Document No. 17, Bankruptcy Docket Entry No. 1389.

**2.** *See* references in footnote 1 above. *See* also Appendix Document No. 6, page 18.

work of the law, such decisions are binding on his lawyer. As typical examples in civil cases, it is for the client to decide whether he will accept a settlement offer.

(See Appendix Document Nos. 33, 16 and 17)

Additionally, and as more fully discussed elsewhere in this Opinion, said plaintiff attorneys violated many of the provisions of the "Ethics Code" when without any notice, advice, discussion and/or consent from the Unsecured Creditors they moved this Court to extend the "bar date" in lieu of converting this case from Chapter 11 to Chapter 7 of the Bankruptcy Code. As more fully discussed elsewhere in this Opinion, the granting of this motion as submitted to this Court would have impacted very adversely against the best financial interests of the Unsecured Trade Creditors who were the very parties who had originally engaged the plaintiff attorneys, Campbell and Levine in the bankruptcy proceeding and Mansmann, Cindrich and Huber in the "fraudulent conveyance litigation".

Further, the granting of the Motion to Extend the "bar date" in lieu of conversion would have insured the continuation of the plaintiff attorneys' admitted vested personal financial interest in the "fraudulent conveyance litigation", since said plaintiff attorneys would be discharged from said case by operation of law if the bankruptcy case were to be converted from Chapter 11 to Chapter 7. The relevant sections of the "Ethics Code" that were violated by plaintiffs' attorneys in this instance are as follows:

DR 5–105. Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

(A) *A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).*

(B) *A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests except to the extent permitted under DR 5–105(C)*

(C) *In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.*

(D) *If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, associate or any other lawyer affiliated with him or his firm may accept or continue such employment.*

Amended April 29, 1977, effective May 14, 1977; amended and effective June 28, 1977.

Interests of Multiple Clients

EC 5–14. *Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employemnt that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse or otherwise discordant.*

EC 5–15. *If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all*

*doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially.* On the other hand, there are many instances in which a lawyer may properly serve multiple clients having potentially differing interests in matters not involving litigation. If the interests vary only slightly, it is generally likely that the lawyer will not be subjected to an adverse influence and that he can retain his independent judgment on behalf of each client; and if the interests become differing, withdrawal is less likely to have a disruptive effect upon the causes of his clients.

EC 5–16. *In those instances in which a lawyer is justified in representing two or more clients having differing interests, it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires. Thus before a lawyer may represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent. If there are present other circumstances that might cause any of the multiple clients to question the undivided loyalty of the lawyer, he should also advise all of the clients of those circumstances.*

(See Appendix Document No. 33)

The Court of Appeals in the case *Re STN Enterprises,* 779 F.2d at 905, lays out the legal considerations that must be addressed by a bankruptcy court prior to granting the Trustee or Debtor or Creditor's Committee (in a proper case) Standing to Sue to recover preferentially and/or fraudulently transferred assets.

First the moving party who is demanding the initiation of litigation to recover the Debtor's assets must present to the bankruptcy court a colorable claim for relief that upon an appropriate proffer of proof would support the claimed recovery.

The Court of Appeals *in re STN Enterprises, Id.* at 905, 906, went on to say:

"If the committee presents a colorable claim or claims for relief that on appropriate proof would support a recovery, the district (or bankruptcy) court's threshold inquiry will still not be at an end. In order to decide whether the debtor unjustifiably failed to bring suit so as to give the creditors' committee standing to bring an action, the court must also examine, on affidavit and other submission, by evidentiary hearing or otherwise, whether an action asserting such claim(s) is likely to benefit the reorganization estate." *See Toledo Equipment Co.,* 35 Bankr. at 320.

The court's inquiries will involve in the first instance not only a determination of probabilities of legal success and financial recovery in event of success, but also a determination as to whether it would be preferable to appoint a trustee in lieu of the creditors' committee to bring suit (bearing in mind any fees imposed on the estate by such an appointment, the wishes of the parties, and other relevant factors) and the terms relative to attorneys' fees on which suit might be brought. The creditors who compose the committee may agree themselves to be responsible for all attorneys' fees, but if they would seek to impose such fees on other creditors or the Chapter 11 estate, whether by contingent fee arrangement or otherwise, that would obviously affect the cost-benefit analysis the court must make in determining whether to grant leave to sue. Hence fee arrangements should not only be made a matter of record but should be carefully examined by the court as it makes that determination.

We do not mean to suggest that the court need undertake a mini-trial, *cf. Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152, 40 L.Ed. 2d 732 (1974) (no mini-trial in class actions), to determine likelihood of success in such a suit or the attendant fees and expenses involved. But it should assure itself that there is sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce. Of course, if the creditors' committee represents that its fee arrangement with its attorney will in no event impose a net burden on the bankruptcy estate (because the committee will pay the fee and seek reimbursement only out of any recovery), then the preliminary inquiry can be limited to ascertaining whether the proposed lawsuit has a colorable basis on which to proceed.

[NOTE (It is apparent from the Second Court of Appeal's references in the above quoted passage from the STN case to the Eisen case to class actions" that in actions to recover "fraudulent conveyances" from third parties the preferable and more ethically correct method of litigating for the benefit of the real parties in interest, i.e. the unsecured creditors, (who have many conflicting financial interests) would be in the context of a class action.)]

In this above-captioned case, there was absolutely no informational notice at all that was distributed to the unsecured creditors informing them that the bankruptcy court was about to consider the appointment of a Bankruptcy Trustee who would then be given permission to file suit along with the Committee of Unsecured Creditors as co-plaintiffs to recover a fraudulent conveyance. Neither was there informational notice that the Unsecured Creditors Committee would be given permission to hire co-counsel to the Trustee's counsel on a contingent fee basis without any knowledge, discussion, advice and/or consent of said "Unsecured Creditors".

The hearing which gave rise to the above-mentioned July 27 and 28, 1983, Bankruptcy Court Orders was scheduled as a "hearing on the objections to the Adequacy of the Debtor's Disclosure Statement" as recited in the July 27, 1983, Order, (Appendix Document No. 2, second page.) Additionally, that announced hearing for reasons given therein was rendered moot and cancelled per said July 27, 1983, Order. The Bankruptcy Court then immediately and without prior notice went into the unscheduled and unannounced matters concerning the suit to recover the "fraudulent conveyance", the engagement of co-counsel and the "contingent fee". There was neither consent nor knowledge of the Unsecured Creditors. The only consent and approval came from the attorney for the Debtor, Sanford M. Lampl and the attorney for the Creditors' Committee, Douglas Campbell. (See Pages 1 through 6 of Appendix Document No. 2)

As hereinabove noted in this Opinion, the Pennsylvania Code of Professional Responsibility under the then and now circumstances of this case absolutely would forbid Campbell and Levine and Mansmann, Cindrich and Huber from taking this case on a contingent fee basis without a "cost-benefit" hearing after notice to interested parties.

Also, as heretofore noted, only the Trustee alone had Standing to Sue under the circumstances of this case.

Because the identities and the full extent of the conflicting and differing legal and financial interests of all of the class of "Unsecured Creditors" were not known, the class action approach absolutely is and was the only manner in which this case could have been or can be litigated in a ethically proper manner. (See references to Law Review Articles, infra)

This District Judge early on identified the many ethical problems in this case, but with the exception of Attorney Beard and Humphreys, was met with unreasoning resistance by the lawyers in this case. It is apparent to this District Judge that plaintiffs' lawyers do not appear to grasp or understand the procedural and ethical difficulties in this "fraudulent conveyance" case and the defense attorneys in bad faith

are interested in procrastination and delay. The Debtor's original attorneys' participation and ongoing advice in this case has been chilled by the official contention of the Trustee to the effect that said Debtor's attorneys former and present should disgorge all prior attorney fees received in this case because of said Debtor attorneys alleged unethical and improper representation of the Debtor. (See Appendix Document No. 6, Page 12) On the other hand the Debtor's Attorney, Pappone who prepared and is proposing the Debtor's Plan of Reorganization which contains a one and one-fourth million dollar offer to settle the "fraudulent conveyance" litigation, is being paid by the defendants in the above-captioned "fraudulent conveyance" litigation case which is very unethical conduct and is contrary to Ethical Considerations, EC 5–21; EC 5–2 and Disciplinary Rule DR 5–107, set out in full as follows: (See Appendix Document No. 33)

#### Desires of Third Persons–"Fraudulent Conveyance Litigation"

EC 5–21 *The obligation of a lawyer to exercise professional judgment solely on behalf of his client requires that he disregard the desires of others that might impair his free judgment. The desires of a third person will seldom adversely affect a lawyer unless that person is in a position to exert strong economic, political, or social pressures upon the lawyer.* These influences are often subtle, and a lawyer must be alert to their existence. *A lawyer subjected to outside pressures should make full disclosure of them to his client, and if he or his client believes that the effectiveness of his representation has been or will be impaired thereby, the lawyer should take proper steps to withdraw from representation of his client.*

EC 5–22 *Economic, political, or social pressures by third persons are less likely to impinge upon the independent judgment of a lawyer in a matter in which he is compensated directly by his client and his professional work is exclusively with his client. On the other hand, if a lawyer is compensated from a source other than his client, he may feel a sense of responsibility to someone other than his client.*

EC 5–23 *A person or organization that pays or furnishes lawyers to represent others possesses a potential power to exert strong pressures against the independent judgment of those lawyers. Some employers may be interested in furthering their own economic, political, or social goals without regard to the professional responsibility of the lawyer to his individual client.* Others may be far more concerned with establishment or extension of legal principles than in the immediate protection of the rights of the lawyer's individual client. On some occasion, decisions on priority of work may be made by the employer rather than the lawyer with the result that prosecution of work already undertaken for clients is postponed to their detriment. *Similarly, an employer may seek, consciously or unconsciously, to further its own economic interests through the actions of the lawyers employed by it. Since a lawyer must always be free to exercise his professional judgment without regard to the interests or motives of a third person, the lawyer who is employed by one to represent another must constantly guard against erosion of his professional freedom.*

DR 5–107 Avoiding Influence by Others Than the Client.

(A) *Except with the consent of his client after full disclosure, a lawyer shall not:*

(1) *Accept compensation for his legal services from one other than his client.*

(2) *Accept from one other than his client any thing of value related to his representation of, or his employment by his client.*

(B) *A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services.*

(See supra pages 33 to 37 of the hearing transcript, Appendix Document No. 16, wherein Attorney Pappone admits that he is being paid by the defendants in the "fraudulent conveyance" litigation to prepare and present a Plan of Reorganization for the Debtor, Jeannette Corp.)

Although the plaintiff attorneys in the above-captioned case were in fact proceeding without a proper and legal authorization, it was conceivable early on as a "very long shot" proposition that they could have "pulled" their "gambit" off successfully since this District Court was not then at all aware of the unethical machinations that occurred in the bankruptcy court that finally brought this "fraudulent conveyance" case to the United States District Court.

However, fate was not kind to the plaintiff attorneys. The first unkind act of fate intervened in this scenario when the plaintiffs alleged a cause of action under the Racketeer Influenced and Corrupt Organization Act (18 U.S.C. Sec. 1961 et seq.) and violations of the Pennsylvania Fraudulent Conveyance Act (39 P.S. Sec. 351, et seq.) against the within defendants and at the time of plaintiffs' complaint there was pending in the United States Third Circuit Court of Appeals a very similar group of cases known collectively as "Gleneagles". *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3rd Cir.1986) *cert. denied sub nom. McClellan Realty Co. v. U.S.*, —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed. 2d 735 (1987).

This District Court Judge felt that it would be wise to hold the trial of this above-captioned case in abeyance in order to await the outcome of Gleneagles which would give needed guidance to this Court. Further, this District Court at that time did not know about the "contingent fee" Court Order, but this Court was concerned about conserving the assets of the Debtor. At least $141,000.00, (and probably more) of the Debtor's assets have already been spent in this "fraudulent conveyance" litigation for expenses only. (See Appendix Document No. 24)

About six months before the United States Supreme Court refused to review the lower court result in Gleneagles, (June 22, 1987) a second stroke of misfortune struck the plaintiff attorneys.

The defendants in early December 1986, offered to settle the within case for one and one quarter million dollars. (See Appendix Document No. 17) At that moment as has been already discussed in this Opinion, the plaintiffs and their attorneys were placed in an impossible position because this case was not certified as a class action. The plaintiffs' attorneys have stubbornly and unreasonably refused to go the "class action way". (See Bankruptcy Rule No. 7023)

Undoubtedly, the real parties in interest are over 2000 Unsecured Creditors; and the plaintiffs' attorneys, even where there are multiple clients involved, are obligated (prior to refusing or accepting an offer of settlement), to in some way inform these Unsecured Creditors of all of the advantages and disadvantages of settlement, so that said Creditors may intelligently determine whether to accept or reject the same. (See the discussion of the ethical consideration heretofore set forth in this opinion and particularly DR 5–106 and EC 7–7 of the Pennsylvania Code of Professional Responsibility Appendix Document No. 33)

Instead of advising and explaining to their clients, (the Unsecured Creditors) the merits or demerits of the proposed settlements as is required by law, the Trustee and his attorneys unilaterally and without notice, discussion or explanation refused the offer of settlement. (See Appendix Document No. 6, page 18)

At this point, the plaintiffs' attorneys were placed again on the horns of a dilemma.

First: As heretofore noted the plaintiffs' attorneys got into this case without first explaining to all of the Unsecured Creditors the "pros and cons" as to whether this case could be tried successfully and further, said plaintiffs' attorneys filed this case without the very great majority of said Unsecured Creditors' knowledge, consent or chance to be heard. Further, the Bankruptcy Court did not conduct a fact finding hearing and/or a cost-benefit hear-

ing after proper notice, to determine if the proposed "fraudulent conveyance" litigation was legally viable and beneficial to this Debtor's estate.

*Second:* As above noted and acting contrary to the Provisions of the Pennsylvania Code of Professional Responsibility and without even an attempt at notifying the several thousands of Unsecured Creditors, the plaintiffs and their attorneys improperly refused the offer of settlement out of hand which they had no lawful right to so do. (See discussion of Ethical Consideration, supra)

As a practical matter the Unsecured Creditors could not have been notified as to the proposed settlement since all of their identities and financial interests were not known then or even now known by the plaintiffs' attorneys.

*Third:* Under the Pennsylvania Code of Professional Responsibility the plaintiffs' attorneys had disqualified themselves as proper attorneys to advise the Unsecured Creditors as to whether they should settle or not since one of those attorneys, Douglas Campbell freely admitted that he, Campbell, had and continued to have a personal vested financial interest in the outcome of the litigation, and under the circumstances at that time said plaintiffs' attorneys should have withdrawn from this litigation because of their admitted conflict of interest.

(See pages 42 to 44 of hearing transcript of December 9, 1986, set out in full, supra. See also said transcript Appendix Document No. 16. See also the discussion of Ethical Considerations, supra and Appendix Document No. 33)

The Plaintiffs' attorneys tried to solve their dilemma by proposing to the Bankruptcy Court the Fifth Plan of Reorganization. (The Trustee's Plan, which was in fact a Liquidation Plan) (See Appendix Document Nos. 5, 6 and 7) The provisions of the Trustee's Plan permitted a vote by the Unsecured Creditors to ratify and/or approve the Trustee's prior rejection of the proposed one and one-fourth million dollar offer of settlement by the defendants without any thorough discussion, explanation or analysis as to the adequacy of amount offered, the benefits to the Unsecured Creditors, versus the benefits of continuing the litigation. Further, the Trustee's Disclosure Statement did not mention the legal consequences of the plaintiffs' attorney's personal vested financial interest in refusing the proposed settlement, and in effect as above-noted, the Unsecured Creditors were requested to ratify the plaintiffs' attorneys rejection of the offer of settlement without giving said Unsecured Creditors a chance to approve the settlement offer and without giving said Unsecured Creditors any dispassionate objective legal advice of any kind whatsoever for said Unsecured Creditor's guidance in the casting of their votes on said Plans, all of which was contrary to the Pennsylvania Code of Professional Responsibility. (See Discussion on Ethical Considerations, Supra)

In the meantime, the Debtor purportedly filed a counter Plan (the Sixth Plan) of Reorganization (also in fact a Liquidation Plan) which discussed the legal and practical reasons why the settlement offer of one and one-fourth million dollars should be accepted by the Unsecured Creditors. This Plan was filed for the Debtor by Mr. Pappone who in fact and unethically was being paid by the defendants in the "fraudulent conveyance" litigation. (See Page 41 of the Findings of Fact herein as underlined.)

A Disclosure hearing on the Debtor's plan was requested by the Debtor. The Bankruptcy Judge, however, only allowed a hearing on the Trustee's proposed Plan (Fifth Plan) and the Trustee's Disclosure Statement and for unexplained reasons the Bankruptcy Judge refused to have the requested hearing as to the Debtor's competing Disclosure Statement.

Even though it is clear beyond any doubt as above noted, that the names and amount of financial interests of all the Unsecured Creditors were and are presently unknown, the Bankruptcy Judge ordered hearing notices as to the Trustee's Plan to be sent out to the "Unsecured Creditors". After having refused to consider the Debtor's oppos-

ing Plan (Sixth Plan) of Reorganization at the hearing on the Trustee's Plan held by the Bankruptcy Court on December 9, 1986, (See Hearing Transcript Appendix Document No. 16) and even though it was impossible for the Unsecured Creditors to vote on the Plan at that time (December 9, 1986, and it is still to this date impossible to identify the voting Unsecured Creditors and/or their dollar interests and even into the foreseeable future) the Bankruptcy Judge nevertheless unreasonably ordered the Trustee's Plan to be submitted to the "Unsecured Creditors" for a vote.

On December 16, 1986, after the "so-called" hearing of December 9, 1986, the Trustee's Attorney Campbell suggested a supplement to the Trustee's Disclosure Statement which disclosed the developments in the Gleneagles Case and that the Debtor had proposed a new Plan of Reorganization wherein the Debtor would settle the "fraudulent conveyance" litigation for one and one-fourth million dollars. (See Appendix Document No. 7)

This "so-called" supplement was captioned, "Notice of Information Which Developed After The Filing of The Trustee's Disclosure Statement", and did not give the Unsecured Creditors an opportunity to vote on whether to accept the settlement offer referred to. In fact as stated on page 18 of the Trustee's Disclosure Statement, (last full paragraph) "A seven figure settlement offer has been made by the (SIC) defendants but was refused." As heretofore discussed, under the Pennsylvania Code of Professional Responsibility, (See Appendix Document No. 33) the Trustee and/or plaintiffs' attorneys could not properly turn down the offer of settlement without the vote of all of the Unsecured Creditors on the proposed settlement.

This arbitrary and clearly erroneous action of the Bankruptcy Judge in allowing this Trustee's Plan to be submitted to the "Unsecured Creditors" for a vote but denying the Unsecured Creditors a chance to vote on the Debtor's Plan was appealed to this Court in due course.

(In the light of the above-recited complication and unethical activity, this District Court withdrew the references as to both Plans of Reorganization from the Bankruptcy Court to the District Court.)

Next a third stroke of misfortune struck the plaintiffs' attorneys in the "fraudulent conveyance" case.

After observing all of the problems and conflicts of interest that had obviously developed to a point where this "fraudulent conveyance litigation" was becoming impossible to bring to trial on an ethically acceptable basis, (because (1) the unsecured financial interests of over 1100 active and inactive employees of the Debtor and the unsecured financial interests of 882 of the trade creditors in the instant "fraudulent conveyance litigation" were clashing irreconciliably and that; (2) this Court was presented with the professionally irresponsible action of the Trustee's attorneys attempting to represent the conflicting interests of the unsecured trade creditors and the conflicting interests of the employee unsecured creditors, simultaneously) this District Court encouraged Attorney Phillip Beard to more actively represent the Debtor's 1100 plus active and in active employees. This Court also encouraged and appointed Attorney David Humphreys on July 9, 1987, to represent the 882 unsecured trade creditors.

After the submission of the Fifth and Sixth Plans of Reorganization, Attorney Beard delved into this case in greater detail. He then took several actions that became the Trustee's attorneys' fourth stroke of misfortune.

In due time Attorney Beard filed approximately sixteen million dollars of new and unscheduled claims for the active and retired Debtor employees.

Because it could be argued that some of these employee unsecured claims were subject to a possible valid objection, i.e., that they were filed after the "bar date" of October 31, 1983, Attorney Beard filed two motions, the granting of either or both would moot the objection to the alleged late filing of the unsecured Debtor employee's belated claims.

Attorney Beard first moved to withdraw the reference on the question of "conversion" from the Bankruptcy Court to the United States District Court. Attorney Beard next moved this District Court to convert the Debtor's bankruptcy proceeding from Chapter Eleven of the United States Bankruptcy Code to Chapter Seven. (See Appendix Document No. 22) If approved, this action would signal the beginning of a new period to make claims, a new "bar date", and the dismissal of Moody, the Trustee, along with his attorneys, Campbell and Levine and Mansmann, Cindrich and Huber (Titus) would follow as a matter of law.

In the alternative, Mr. Beard moved this District Court to extend the "bar date" (October 31, 1983) to a time after Mr. Beard had filed the unsecured Debtor employee new claims.

There could be no doubt that the financial interests of the other group of Unsecured Creditors, namely, 882 trade creditors, would be very adversely affected by the infusion of 18 million dollars of new unsecured claims into this bankruptcy case. Mr. Humphreys, the attorney for the 882 "trade creditors" immediately bitterly opposed both of Mr. Beard's motions.

If the Trustee's (Plaintiff) attorneys had been well advised they would have "sat on the sideline" and allowed Mr. Beard and Mr. Humphrey to battle each other on these two motions. Instead said Trustee (Plaintiff) attorneys filed a Motion to Extend the Claims bar date in lieu of conversion. (See Appendix Document No. 31 which is a copy of said motion and Document No. 32, which is a "Joint Memorandum in Opposition to the Trustee's Motion to Extend the "claims bar date" in Lieu of Conversion".)

With Mr. Campbell openly admitting that as of December 9, 1986, he and Co-counsel Cindrich had personal vested financial interests in the "fraudulent conveyance" litigation, (See Supra and pages 42 to 44 of transcript of hearing December 9, 1986, and Appendix Document No. 16 contrary to Pennsylvania Code of Professional Responsibility) and admitting that they automatically would be removed as counsel for the Debtor–Trustee in the "fraudulent conveyance litigation" if the bankruptcy proceeding were to be converted from Chapter Eleven to Chapter Seven, (See line 6, page 24, of hearing transcript of December 9, 1986; See Appendix Document No. 16), it is clear that Attorneys Campbell and Cindrich filed the motion to extend the "bar date" in lieu of "conversion" to protect their own "personal vested (33% contingent fee) interest" in the "fraudulent conveyance" litigation. This conclusion is suggested by the "fraudulent conveyance" defense attorneys in Appendix Document No. 28. By moving to have the "bar date" extended in lieu of conversion to protect their personal financial "contingent fee" interests in the "fraudulent conveyance litigation" and by moving to have the "fraudulent conveyance" case immediately tried, without advising any of the Unsecured Creditors about said Unsecured Creditors' right prior to any trial to be properly informed as to the pros and cons of the settlement offer and their right as Unsecured Creditors to vote on said proposed settlement offer of one and one quarter million dollars, said Attorneys Campbell and Cindrich clearly violated the Code of Professional Responsibility. (See Ethical Discussion, Supra) (See Appendix Document Nos. 27, 28 and 29)

Attorneys Campbell and Cindrich were specifically hired or engaged by a Committee of Unsecured Trade Creditors in this "fraudulent conveyance" litigation presumably to represent said Unsecured Trade Creditors' best financial interests. Here Campbell and Cindrich's motion to extend the "bar date" would, if allowed, increase the claims of the Unsecured Debtor employees and retirees up to eighteen million dollars to a finite sum of money. (i.e. the final cash balance on hand in the Debtor's bank account after administration expenses are paid.)

Prior to Attorney Beard's filing of the additional employee claims of some sixteen million dollars after the "bar date" of October 31, 1983, the employee claims were approximately one million dollars. So as to any final sum of money available for distri-

bution the Unsecured Trade Creditors would have received four dollars for every dollar given to the active or retired employees, assuming that none of the sixteen million dollars of employee claims are allowable if said claims were filed after the "bar date" of October 31, 1983.

On the other hand, if the Campbell–Cindrich Motion to Extend the "bar date" were granted to allow all late employee claims to be validly filed, the active and inactive employees as a group would then receive approximately four and one-half dollars for every dollar given to the Unsecured Trade Creditors. This motion of Campbell and Cindrich to extend the "bar date" is clearly adverse to the financial interests of the Unsecured Trade Creditors who, in fact, employed Attorneys Campbell and Cindrich to represent them in both the bankruptcy matter and in the "fraudulent conveyance" litigation. Of course this action of said two attorneys violates many sections of the Pennsylvania Code of Professional Responsibility. (See Ethical Discussion, Supra).

It seems clear that Attorneys Campbell and Cindrich have demonstrated from the beginning of this case that they have no concept of the duty of attorneys to be loyal to their clients.

This Court is convinced and the undisputed facts of this case supports the fair inference that Attorneys Campbell and Cindrich oppose the conversion of this case from Chapter Eleven to Chapter Seven for "pure bad faith selfish financial reasons", namely, their admitted vested financial interest as attorneys in this "fraudulent conveyance" case, and their fear of losing out as counsel for the plaintiff in this "fraudulent conveyance litigation" if this bankruptcy case is converted from Chapter Eleven to Chapter Seven. (See Appendix Document Nos. 16 and 28)

As heretofore noted, the reason that contingent fee arrangements are permitted is to encourage lawyers to offer legal services to deserving litigants who lack sufficient money to litigate and pay for the same on an hourly basis. In this case as aforementioned the Debtor had more than one and one-half million dollars of cash in the bank and presently has more than two million dollars on deposit. There was never any need for a one-third contingent fee agreement in this "fraudulent conveyance" case and if there had been a bankruptcy court hearing that would have established, after a cost-benefit analysis that the litigation should go forward on a "class action" basis, none of these ethical problems would have arisen. This bad faith hope for a gigantic reward of twelve million dollar attorney fee for success in this litigation by the plaintiff's attorneys and their apparent lack of knowledge of the Pennsylvania Code of Professional Responsibility is the root cause of the problems and delay that have beset this matter over the last five years.

Because this Chapter 11 proceeding is presently being maintained for bad faith unethical reasons, this bankruptcy proceeding must be converted to Chapter 7 of the Bankruptcy Code, as amended, for just cause.

## SUMMARY

For the foregoing reasons (four separate and distinct reasons), this bankruptcy matter filed at Bankruptcy No. 82–3265, in the United States Bankruptcy Court for the Western District of Pennsylvania, was converted from Chapter 11 proceeding to a Chapter 7 proceeding by the order of this United States District Court, dated March 15, 1988, and filed of record in Civil Action No. 83–2383, at Docket Entry No. 410.

Also, this entire case in the Bankruptcy Court as to the liquidation of the Debtor and as to contested claims and the on-going "fraudulent conveyance" action in the District Court should be addressed as a "class action" under the new Bankruptcy Rule No. 7023, and under the Federal Rules of Civil Procedure, Rule 23, *et seq.*

A reading of the following Law Review Articles by the several counsel of record will be very helpful in the future disposition of this case.

The Class Action and Bankruptcy: Tracking and Evolution of a Legal Principle. By Paul C. Wohlmuth, Vol. 21

UCLA Law Review, Page 577 (1973) (See Appendix Doc. No. 37)

Mandatory Certification of Settlement Classes, by Elizabeth Joan Cabraser. Vol. 10, Class Action Reports, Page 151, (1987). (See Appendix Doc. No. 38)

Class Actions in Bankruptcy, by Jennifer Knauth Lipinski, Vol. 64 Texas Law Review, Page 791 (1985). (See Appendix Document No. 39)

Leveraged Buyouts and Fraudulent Transfers: Life After Gleneagles, by David A. Murdoch, Linda D. Sartin and Robert A. Zadek, Vol 43, The Business Lawyer, Page 1 (Nov. 1987) (See Appendix Document No. 40)

Fraudulent Conveyance Concerns in Leveraged Buyout Lending, by Matthew T. Kirby, Kathleen G. McGuinnes and Christopher N. Kandel, Vol. 43 The Business Lawyer, Page 27 (Nov. 1987) (See Appendix Document No. 41)

(NOTE: Appendix Document No. 17, (the letter extending indefinitely the offer of settlement of 1¼ million dollars in the "fraudulent conveyance case") was made part of the official record as Bankruptcy Docket Entry No. 1389.